2017 ND 263

**Barry C. GARCIA, Petitioner and Appellant**

v.

**STATE of North Dakota, Respondent and Appellee**

No. 20170030

Supreme Court of North Dakota.

Filed 11/16/2017

Samuel A. Gereszek (on brief), East Grand Forks, Minnesota, and John R. Mills (argued), San Francisco, California, for petitioner and appellant.

Birch P. Burdick, State's Attorney, Fargo, North Dakota, for respondent and appellee.

Tufte, Justice.

[¶ 1] Barry Garcia appeals from a district court order summarily dismissing his application for post-conviction relief. He argues his sentence of life imprisonment without the possibility of parole was imposed in violation of the Eighth Amendment and this Court should eliminate his parole restriction or remand for resentencing. We affirm.

I

[¶ 2] On the evening of November 15, 1995, sixteen-year-old Barry Garcia drove around Fargo–Moorhead with three teen-

age members of the Skyline Piru Bloods street gang. The teens carried with them a sawed-off shotgun owned by the gang and 10 to 15 shotgun shells. While driving in a West Fargo residential area around 10 p.m., Garcia asked the driver to stop, after which he and another young man exited the vehicle. Garcia took the shotgun in hand, and the two began walking around the neighborhood.

[¶ 3] Nearby, Pat and Cherryl Tendeland were dropping off their friend, Connie Guler, at her home. Guler saw the two teens walking down the sidewalk toward the Tendeland car. Guler thought she saw the shorter of the two, later identified as Garcia, carrying a gun, but Pat Tendeland thought it was an umbrella. The two teens stood near Guler's driveway for a while and then began walking back toward the Ford sedan. Thinking this was suspicious behavior, Pat Tendeland drove slowly away from Guler's driveway toward the Ford sedan. Garcia lagged behind the other teen, who walked briskly toward the Ford sedan. As the Ford started to pull away, Guler turned and saw Garcia standing next to the front passenger window of the Tendeland car. Garcia raised the shotgun and shot Cherryl Tendeland in the forehead. Shotgun pellets also struck Pat Tendeland's face. Pat Tendeland drove toward a nearby police station while Guler, a nurse, tended to Cherryl's wounds. Upon realizing the severity of Cherryl's wounds, they stopped and called 911 for emergency assistance. An ambulance arrived and took the Tendelands to the hospital. Cherryl Tendeland was pronounced dead at the emergency room.

[¶ 4] Police officers determined the address of the Ford sedan's registered owner from a description of the sedan and its license plate number. The officers then located the car when it turned into the owner's driveway at 11:45 p.m. Garcia alone refused police orders to either remain in the car or lie on the ground. He fled on foot. Police recovered a sawed-off shotgun from the sedan's backseat along with several shotgun shells. Police chased Garcia and arrested him at a nearby athletic field. He had four shotgun shells in his possession. A juvenile petition was filed alleging Garcia had committed murder, attempted robbery, aggravated assault, and criminal street gang crime. At the State's request, the court transferred Garcia to adult court for trial.

[¶ 5] At trial, the district court dismissed the robbery and criminal street gang charges. The jury found Garcia guilty of murder, a class AA felony, and aggravated assault, a class C felony. After a sentencing hearing, the district court sentenced Garcia to life imprisonment without parole on the murder conviction, and to a concurrent five years' imprisonment on the aggravated assault conviction.

[¶ 6] Garcia appealed, arguing his sentence constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution. This Court affirmed his conviction and sentence. *State v. Garcia*, 1997 ND 60, ¶ 60, 561 N.W.2d 599, *cert. denied*, 522 U.S. 874, 118 S.Ct. 193, 139 L.Ed.2d 131 (1997).

[¶ 7] In 1998, Garcia applied for post-conviction relief. The district court denied his application, and Garcia appealed. While his appeal was pending, he filed a second application for post-conviction relief, and the district court denied the application. Garcia appealed, and the two appeals were consolidated. This Court affirmed the district court's decisions. *Garcia v. State*, 2004 ND 81, 678 N.W.2d 568.

[¶ 8] In 2004, Garcia petitioned for a writ of habeas corpus in federal district court, raising many of the same issues he raised in his prior state cases, including that his sentence amounts to cruel and unusual

punishment under the Eighth Amendment and that his counsel was ineffective because he failed to present mitigating information during sentencing. *Garcia v. Bertsch*, 2005 WL 4717675 (D. N.D. Sept. 12, 2005). The federal district court denied his petition. Garcia appealed, and the Eighth Circuit Court of Appeals affirmed the federal district court's decision. *Garcia v. Bertsch*, 470 F.3d 748 (8th Cir. 2006), *cert. denied*, 551 U.S. 1116, 127 S.Ct. 2937, 168 L.Ed.2d 267 (2007).

[¶ 9] In 2013, Garcia petitioned for a writ of habeas corpus in federal district court, arguing his sentence constitutes cruel and unusual punishment because he was a juvenile at the time of the offense, citing *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). The federal district court concluded it lacked subject matter jurisdiction over Garcia's second petition and dismissed the petition without prejudice. *Garcia v. Bertsch*, 2013 WL 1533533 (D. N.D. Apr. 12, 2013).

[¶ 10] In 2016, Garcia applied for post-conviction relief, arguing his sentence constitutes cruel and unusual punishment and violates the North Dakota and United States Constitutions. After an attorney was appointed to represent Garcia, his application was supplemented, arguing his sentence is unconstitutional as a result of recent United States Supreme Court decisions causing a significant change in substantive and procedural law.

[¶ 11] The State moved to dismiss or for summary disposition. After a hearing, the district court denied the State's motion to dismiss, granted the State's motion for summary disposition, and denied Garcia's application for post-conviction relief.

## II.

[¶ 12] An application for post-conviction relief may be summarily dismissed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Leavitt v. State*, 2017 ND 173, ¶ 4, 898 N.W.2d 435. We review an appeal of a summary denial of post-conviction relief as we would review an appeal from summary judgment. *Id.* "The party opposing the motion is entitled to all reasonable inferences at the preliminary stages of a post-conviction proceeding and is entitled to an evidentiary hearing if a reasonable inference raises a genuine issue of material fact." *Id.* (quoting *Lindsey v. State*, 2014 ND 174, ¶ 7, 852 N.W.2d 383).

[¶ 13] Garcia argues the district court erred in summarily dismissing his application for post-conviction relief, because his sentence of life imprisonment without parole was imposed in violation of the Eighth Amendment to the United States Constitution. He contends the district court inflicted cruel and unusual punishment by sentencing him without an individualized consideration of the distinct attributes of his youth and giving mitigating effect to his youth before he was sentenced to life without parole.

[¶ 14] The issue raised by Garcia is not a facial challenge to the statutes authorizing the sentence he received. Rather, he argues his sentence violates the Eighth Amendment as a result of inadequate consideration by the sentencing court at the sentencing hearing regarding whether Garcia's murder conviction reflected transient immaturity or irreparable corruption. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1224 (2010) ("A violation of the Constitution is an event. There is a moment before the constitutional violation. There is a moment after the violation."). If the district court at sentencing in 1996 gave adequate consideration to these factors, the sentence was constitutional when imposed and remains constitutional today. If these

factors were not adequately considered, Garcia argues he must have a new sentencing hearing or we must strike the restriction on parole eligibility from his sentence.

[¶ 15] The Eighth Amendment to the United States Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment applies to the states through the Fourteenth Amendment. *Roper v. Simmons*, 543 U.S. 551, 560, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The U.S. Supreme Court has explained that "proportionality is central to the Eighth Amendment" and the amendment's protections include "the right not to be subjected to excessive sanctions." *Miller*, 567 U.S. at 469, 132 S.Ct. 2455 (citations omitted). The proportionality of a sentence is measured with reference to both the offense and the offender. *Id.* The prohibition against cruel and unusual punishment applies to both capital and non-capital cases. *Garcia*, 1997 ND 60, ¶ 47, 561 N.W.2d 599.

[¶ 16] Garcia previously argued to this Court that his sentence constituted cruel and unusual punishment, and we rejected his argument. *Garcia*, 1997 ND 60, ¶ 46, 561 N.W.2d 599. However, since that decision, the United States Supreme Court has decided several cases related to sentencing juvenile offenders and has said that juveniles are constitutionally different from adults such that certain punishments are disproportionate when applied to most juveniles.

[¶ 17] In *Roper*, the Supreme Court held the imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed constitutes cruel and unusual punishment and is prohibited by the Eighth Amendment. 543 U.S. at 574–75, 125 S.Ct. 1183 (overruling *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989)). The Court stated juvenile offenders are different from adults and their culpability is diminished because they lack maturity and have an underdeveloped sense of responsibility often resulting in impetuous and ill-considered actions and decisions, they are more susceptible to negative influences and outside pressures, their character is not as well-formed, and their personality traits are more transitory and less fixed. *Id.* at 569–71, 125 S.Ct. 1183. The Court also stated the penological justifications for the death penalty apply to juveniles with less force than to adults because of their diminished capacity. *Id.* at 571, 125 S.Ct. 1183.

[¶ 18] In *Graham v. Florida*, 560 U.S. 48, 82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), the Supreme Court held the Eighth Amendment prohibits imposition of a sentence of life without parole on a juvenile offender for a non-homicide crime. The Court considered juvenile offenders' limited culpability, the penological justifications, and the severity of the sentence and concluded a sentence of life without parole for a juvenile offender who did not commit homicide is cruel and unusual and violates the Eighth Amendment. *Id.* at 69–74, 130 S.Ct. 2011.

[¶ 19] *Roper* and *Graham* established that children are constitutionally different from adults for purposes of Eighth Amendment challenges to disproportionate sentencing. *Miller*, 567 U.S. at 471, 132 S.Ct. 2455. In *Miller*, at 465, 132 S.Ct. 2455, the Supreme Court extended the rationale of *Roper* and *Graham* to declare unconstitutional all mandatory sentences of life imprisonment without parole for juveniles convicted of homicide. The Court reasserted that juveniles are less deserving of the most severe punishments because they have diminished culpability and greater prospects for reform, and that the

distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders. *Id.* at 471–72, 132 S.Ct. 2455. The Court said the characteristics of youth matter in determining the appropriateness of a life without parole sentence and a mandatory sentencing scheme takes from the sentencer the opportunity to consider the "mitigating qualities of youth." *Id.* at 473–76, 132 S.Ct. 2455. The Court noted youth is a time of immaturity, irresponsibility, impetuousness, and recklessness; youth may also be more susceptible to influence and to psychological damage; and these "signature qualities" of youth are all "transient." *Id.* at 476, 132 S.Ct. 2455 (quoting *Johnson v. Texas,* 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). The Court held the Eighth Amendment forbids mandatory sentences of life in prison without the possibility of parole for juvenile offenders, explaining:

> [G]iven all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 479–80, 132 S.Ct. 2455 (citations omitted). The Court further explained its decision did not categorically bar the penalty of life in prison without the possibility of parole, but it mandates that a sentencer consider a juvenile offender's youth and attendant characteristics before imposing the sentence. *Id.* at 483, 132 S.Ct. 2455.

[¶ 20] In *Montgomery v. Louisiana,* —— U.S. ——, 136 S.Ct. 718, 736, 193 L.Ed.2d 599 (2016), the Supreme Court held its decision in *Miller* announced a new substantive constitutional rule that applies retroactively to juvenile offenders whose convictions and sentences were final when *Miller* was decided. The Court reasserted:

> *Miller* requires that before sentencing a juvenile to life without parole, the sentencing judge take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." The Court recognized that a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified. But in light of "children's diminished culpability and heightened capacity for change," *Miller* made clear that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon."

Miller, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " Because *Miller* determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " it rendered life

without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

*Id.* at 733–34, 136 S.Ct. 718 (citations omitted). "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at 734, 136 S.Ct. 718. The Court held that *Miller* applies retroactively and that prisoners who received a mandatory sentence of life in prison without the possibility of parole for an offense committed when they were juveniles must be given the opportunity to show their crime did not reflect irreparable corruption. *Id.* at 736, 136 S.Ct. 718.

[¶ 21] When the U.S. Supreme Court determines that one of its decisions applies "retroactively," it suggests that the rule announced in the decision did not exist prior to that decision and yet will be given application to judgments made final before the decision issued. *Danforth v. Minnesota*, 552 U.S. 264, 271, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008). That "is incorrect." *Id.* By declaring *Miller* to be retroactive, *Montgomery* means that because the source of the *Miller* rule "is the Constitution itself," it "necessarily pre-exists our articulation of the new rule." *Id.* Thus, *Montgomery* states that the Eighth Amendment always required a sentencing court to consider youth, and what the Supreme Court articulates in 2015 is simply a clearer formulation of the requirements that the Eighth Amendment demanded of sentencing courts in 1996.

[¶ 22] The holding of *Miller* is limited to mandatory sentences of life in prison without the possibility of parole, and its central rationale rests on the mandatory nature of the sentence prohibiting the sentencing court from considering the mitigating attributes of youth. The Court's broader rationale applies to all cases where juvenile offenders are sentenced to life without the possibility of parole: "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Miller*, 567 U.S. at 473, 132 S.Ct. 2455. The Court elaborated in *Montgomery*: "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" *Montgomery*, 136 S.Ct. at 734 (quoting *Miller*, 567 U.S. at 479, 132 S.Ct. 2455). The Court further stated, "*Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Montgomery*, at 736. Although the holding in *Montgomery* applies only to mandatory sentences, we understand the touchstone for Eighth Amendment proportionality analysis is that consideration of whether a juvenile's crimes reflect "transient immaturity" rather than "irreparable corruption" is required even when a sentence of life without parole is imposed as a matter of the sentencing court's discretion.

[¶ 23] Garcia was sentenced to life in prison without parole after an individualized sentencing hearing. However, he was sentenced before *Miller* and *Montgomery* were decided, and the district court lacked the specific articulation that it was to distinguish between those whose crimes reflect "permanent incorrigibility" or "irreparable corruption" as opposed to "transient immaturity." We read these not as magic words without which a sentence cannot pass muster under the Eighth Amendment, but, instead, we review the district court's sentencing hearing to de-

termine whether it met the substantive requirements of *Miller* and *Montgomery* in its consideration of youth and its attendant circumstances. Without that substantive compliance, Garcia's sentence of life imprisonment without parole would have been imposed in violation of the Eighth Amendment.

[¶ 24] At the sentencing hearing, both the State and Garcia's attorney made arguments supporting their recommended sentences. The State described Garcia's "unstable, chaotic" family history, his father's imprisonment, his mother's murder, and his choice to commit numerous crimes. The State also noted that an evaluation by the North Dakota State Hospital determined Garcia was "minimally amenable" to rehabilitation and that Garcia had not shown any responsibility or remorse. Garcia did not testify or make a personal statement during the sentencing hearing. His attorney did argue that the court should consider Garcia's age. Garcia's attorney argued the court should remember Garcia was young, young people exercise extremely poor judgment and do not think before things happen, and a doctor at the State Hospital said he was "minimally amenable" to treatment but did not say he was not amenable to treatment. Garcia's attorney argued young people do not have any insight and may be written off as being total failures, but a lot of those people straighten themselves out. Garcia's attorney did not offer witnesses or other evidence, but he argued that Garcia's family was supportive and were willing to testify that Garcia had been great with his younger brothers, he took care of them, and he had assumed the responsibility of a parent in certain situations. He requested the court not "write off" Garcia but give him an opportunity to change. He recommended the court sentence Garcia to thirty years in prison or, alternatively, to life

with the opportunity for parole to give Garcia an incentive to complete any programs available to him and to allow the parole board an opportunity to look at what he has done while in prison.

[¶ 25] The district court said it considered information from various documents, including the presentence investigation, the information, police reports, Garcia's statement shortly after his arrest, a report from the State Hospital, and victim impact statements. The court made specific findings about the statutory sentencing factors under N.D.C.C. § 12.1–32–04 and explained its decision to sentence Garcia to life in prison without the possibility of parole, stating:

> *The defendant acted under strong provocation.* Best evidence at this point indicates that Mr. Garcia fired a shotgun at point-blank range at Mrs. Tendeland because she looked at him the wrong way. That is not provocation. In fact, it's the most senseless explanation for a murder I have ever heard of. That favors the State's position.
>
> *There are substantial grounds present which tend to excuse or justify the defendant's conduct.* The only argument that seems to have been offered to excuse or explain this conduct has been youth and/or drug use. There is simply no basis for believing that the drug use on the night in question was the cause of the defendant's conduct. In fact, juveniles . . . the defendant's juvenile history would indicate that he has a serious history of serious assaults and that his problems are most likely the result of an unresolved anger problem, and that he possesses some sort of an explosive personality.
>
> His record would indicate that he's the type of individual who is likely to blow at any point. There does not seem to be any justification for the conduct in

this case. That favors the State's position.

. . . .

*The defendant's history of previous offenses and/or lapse of time since any previous offenses.* In reviewing the juvenile history of the defendant, it appears that there are 16 convictions in the past—well, in a period of time from June of 1993 through September of 1995. A number of the offenses would have been felonies had they been committed by an adult.

Included in those 16 priors are five assaults or terroristic convictions. The defendant has shown a criminal pattern of increasing violence and consistent violence. That favors the State's position.

*Eight, the defendant's conduct was the result of circumstances unlikely to recur.* The crime in this case remains unexplained to such a degree that the best evidence before the Court is simply that Mr. Garcia acted on an impulse, that that impulse was the result of being looked at the wrong way. This is certainly a set of circumstances that could recur at any point.

As I have indicated earlier, the best evidence is that the defendant has an explosive personality. I think that the best evidence would suggest that this could recur. This favor's [sic] the State's position.

*The defendant's unlikely to commit another crime.* The defendant's prior history indicates that he's a one-person judicial wrecking crew. He's committed any number of crimes. And I think that there's no reason to believe that he'll refrain from committing crimes in the future.

*The defendant's likely to respond affirmatively to probation.* He's been involved in the probation system for years

and has failed to respond to treatment. It favors the State's position.

. . . .

*The fifteenth factor is other factors.* There are a couple of other factors that the Court deems to be significant. The first is Mr. Garcia's youth. All human beings possess certain inalienable attributes. And one of these is the possibility of redemption or rehabilitation. It is possible for a person to undergo, as a result of a life-changing circumstance, youth, spiritual, and personal change. These types of changes are more likely to occur in young people than they are in older people because, in young people, their personalities are still in formation.

However, in order for this to be accomplished, the person must be willing to admit the wrongfulness of their conduct, their powerlessness to change what has already happened, and to express a real willingness to make amends to the fullest extent possible.

In this case, Mr. Garcia has not demonstrated that he understands the seriousness of his crime or that he has changed as a result of his experiences.

I came to this case with a personal philosophy. I think that it's safe to say that every judge, when they take the bench, comes to every case with a personal philosophy. My personal philosophy is that young people are never beyond redemption.

My personal philosophy is that particularly young people are capable of changing, they are capable of reforming their lives, that they are capable of starting anew.

I came to this case, looking for some reason, some justification, some excuse, to hand down a sentence less than the maximum. Mr. Garcia has given me no alternative, he has given me no opportunity.

. . . .

If I had heard anything from you that indicated to me that you had started this path of change, that you had started the process of change, I might have viewed your lawyer's pleas far more sympathetically. You haven't given me any reason to believe that you've—that you're in a position to change.

[¶ 26] *Miller* held a sentence of life without parole for a child whose crime reflects transient immaturity is a disproportionate punishment and therefore unconstitutional. *Montgomery*, 136 S.Ct. at 735. *Miller*, 567 U.S. at 480, 132 S.Ct. 2455, requires the sentencer to take into account how children are different from adults, and how those differences counsel against irrevocably sentencing a child to a lifetime in prison. *Miller* did not impose a formal factfinding requirement, and the sentencer is not required to use the words "incorrigible" or "irreparable corruption." *Montgomery*, at 735. *Miller* "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, at 483, 132 S.Ct. 2455.

[¶ 27] The district court considered Garcia's age, the circumstances of the offense, and his prior criminal history, and recognized that young people are more capable of rehabilitation. The court considered how children are different and said young people are never beyond redemption and are capable of changing and reforming their lives, but Garcia did not do anything to indicate he can change. The court considered the circumstances of the crime and the lack of any justification for Garcia's conduct. The court considered Garcia's criminal history, which showed a pattern of increasing and consistent violence, and his history of violating probation. The court considered Garcia's youth and attendant circumstances and determined Garcia deserved a sentence of life without parole, despite his youth. Garcia is the only person in North Dakota serving a life without parole sentence for a crime committed when he was a minor. Without using the precise words the Supreme Court used in *Miller*, the court found Garcia to be the rare juvenile offender whose crime reflected irreparable corruption and not transient immaturity. *See Johnson v. State*, 162 Idaho 213, 395 P.3d 1246, 1258–59 (2017) (rejecting *Miller* claim where sentencing court "clearly considered Johnson's youth and all its attendant characteristics").

[¶ 28] Garcia argues that even if the sentencing court gave consideration to youth, the significance of that factor has changed to such a degree that a new sentencing hearing is required. As authority, he cites *Bobby v. Bies*, 556 U.S. 825, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009). In *Bies*, the Supreme Court considered the change in legal circumstances resulting from *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Prior to *Atkins*, intellectual disability was a mitigating factor in considering eligibility for the death penalty. After *Atkins*, a determination of intellectual disability barred imposition of the death penalty. *Bies* stands for the proposition that the significant shift in importance from intellectual disability as one factor among several to one having conclusive importance required further proceedings. The change in legal significance of youth resulting from *Montgomery* is superficially similar to but distinguishable from the change at issue in *Bies*. *Bies* explained that the prosecution may have little incentive to challenge mitigating evidence of intellectual disability because that same evidence may support the aggravating factor of future dangerousness. *Bies*, at 836–37, 129 S.Ct. 2145. *Atkins* thus

completely changed the incentives. Here, *Montgomery* does not change the incentive of either the prosecution or Garcia in highlighting youthful prospects for rehabilitation. Youth was the central thrust of Garcia's plea for mercy. The State's central argument was that, despite his youth, Garcia had demonstrated a pattern of increasingly violent and senseless offenses and had demonstrated nothing to question the state hospital's assessment that he was "minimally amenable" to rehabilitation.

[¶ 29] Garcia's sentencing fulfilled the requirements from *Miller* and *Montgomery*. His sentence is proportionate to the offender and the offense and does not violate the Eighth Amendment's prohibition of cruel and unusual punishment. We conclude the district court did not err in summarily dismissing Garcia's application for post-conviction relief.

### III

■ [¶ 30] Garcia argues his case should be remanded to the district court to provide him with an opportunity to request a reduction in the length of his sentence under N.D.C.C. § 12.1–32–13.1. He contends the statute allows juvenile offenders to seek a sentence reduction after they have served twenty years and he is potentially eligible for relief under the new law. The State argues the statute does not allow Garcia to move for a reduction in sentence, because it does not apply retroactively.

[¶ 31] In 2017, the legislature enacted N.D.C.C. § 12.1–32–13.1, and the statute became effective on August 1, 2017. Section 12.1–32–13.1(1), N.D.C.C., allows defendants who were convicted of an offense committed before they were eighteen years old to request a reduction in their sentence, stating:

Notwithstanding any other provision of law, a court may reduce a term of imprisonment imposed upon a defendant convicted as an adult for an offense committed and completed before the defendant was eighteen years of age if:

a. The defendant has served at least twenty years in custody for the offense;

b. The defendant filed a motion for reduction in sentence; and

c. The court has considered the factors provided in this section and determined the defendant is not a danger to the safety of any other individual, and the interests of justice warrant a sentence modification.

The statute requires the court to consider various factors in deciding whether to reduce a term of imprisonment, including the age of the defendant at the time of the offense, whether the defendant has demonstrated maturity and rehabilitation, the defendant's family and community circumstances at the time of the offense, and juveniles' diminished culpability and failure to appreciate risks and consequences. N.D.C.C. § 12.1–32–13.1(3).

■ [¶ 32] Because section 12.1–32–13.1 became law after Garcia's petition for post-conviction relief, Garcia could not and did not move for a reduction in his sentence under this statute before the district court. Issues that were not raised before the district court will not be considered for the first time on appeal. *Linstrom v. Normile*, 2017 ND 194, ¶ 19, 899 N.W.2d 287. Although the parties have fully briefed to us the issue of whether this new statute applies retroactively to Garcia's final conviction, we leave for the district court to determine in the first instance whether Garcia comes within its scope. *See State v. Iverson*, 2006 ND 193, ¶¶ 6–8, 721 N.W.2d 396 (explaining application of ameliorative penal legislation exception to general rule against retroactivity).

## IV.

[¶ 33] We conclude the district court's 1996 sentencing of Garcia to life imprisonment without parole did not violate the Eighth Amendment. We affirm the district court's order summarily dismissing Garcia's application for post-conviction relief.

[¶ 34] Jerod E. Tufte

Daniel J. Crothers

Lisa Fair McEvers

Jon J. Jensen

Gerald W. VandeWalle, C.J.