## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-00899-COA

BRETT JONES A/K/A BRETT A. JONES                            APPELLANT

v.

STATE OF MISSISSIPPI                                        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 04/17/2015 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT B. MCDUFF |
| | JACOB WAYNE HOWARD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| DISTRICT ATTORNEY: | TRENT KELLY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/14/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1. Brett Jones previously was convicted for the murder of his grandfather and sentenced to life imprisonment. Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), the circuit court held a hearing to determine whether Jones, who was fifteen years old when he killed his grandfather, was entitled to parole eligibility under *Miller*. Following that hearing, the circuit court found that Jones was not entitled to relief under *Miller*. Jones appeals the circuit court's ruling and alleges that his sentence is unconstitutional and that the circuit judge did not comply with the requirements of *Miller* and related case law. We find no error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.    This Court's prior opinion affirming Jones's conviction and sentence on direct appeal

discussed the facts of the murder:

> During August of 2004, Jones was living with his paternal grandparents, Bertis
> Jones and Madge Jones. Jones's girlfriend, Michelle Austin, had run away
> from home in the first week of August 2004. Austin was staying mostly at
> Jones's grandparents' home, as well as at an abandoned fish restaurant near the
> home. On August 9, 2004, Bertis Jones discovered Austin in Jones's bedroom
> and told her to get out of his house. Austin then ran to the fish restaurant. . . .
> Jones and his cousin, Jacob, later came and told her that Jones was "in big
> trouble" with his grandfather. Austin testified that she asked Jones, "What are
> you going to do? Kill him?" Austin testified that Jones did not respond to this
> question. Austin also testified that Jones "said that he was going to hurt his
> granddaddy."
>
> Jones testified that at about 4 p.m., he went into the kitchen to make a
> sandwich, and he and the victim got into an argument. Jones "sassed" him, at
> which point the argument escalated. Jones testified that his grandfather got in
> his face, pointing and yelling at him. He testified that his grandfather had
> never done that before. He testified that his grandfather then pushed him, that
> he pushed him back, and his grandfather then swung at him. Jones testified
> that he had a steak knife in his hand from making a sandwich, and because he
> "didn't have anywhere to go between the corner and him," he "threw the knife
> forward," stabbing his grandfather. He testified that his grandfather backed
> up, looked at the wound, and came at Jones again. Jones again stabbed him
> and tried to get past his grandfather. Jones testified that his grandfather
> grabbed him, they fought some more, and Jones then grabbed a filet knife. He
> stabbed his grandfather with this knife. . . .
>
> . . . .
>
> [Jones claimed that he tried to save his grandfather by administering CPR but
> that his grandfather stopped breathing.] Jones then pulled the body into the
> laundry room and shut the door. Jones used a water hose to try and clean the
> blood off of his arms, and then threw his shirt in the garbage under the sink.
> He then attempted to cover up the blood spots in the carport by pulling his
> grandfather's car over them. Jones testified that he walked around the house

2

and saw Robert "Frisco" Ruffner; at this point, Jones was covered in blood.

Ruffner, who was living with and doing yard work for Thomas Lacastro, a neighbor at the time, testified that he had "heard an old man, you know, like holler out he was in pain," and about two or three minutes later, he saw Jones walking toward him covered in blood. Ruffner testified that Jones was carrying a knife, trembling and saying, "Kill, kill." Ruffner then ran into the house and called 911.

Thomas Lacastro arrived while Ruffner was on the phone with the police, and Ruffner related to Lacastro what he had seen. Ruffner was hysterical at the time, and Lacastro did not, at first, believe him. Ruffner told Lacastro that Jones had killed his grandfather. Lacastro then saw Jones in the bushes and asked him to come over to his house. Lacastro testified that Jones was pale and "had some blood on him." Lacastro testified that he asked Jones, "Where's your grandfather?" Jones answered, "He's gone," and Lacastro responded, "No, he's not gone. His car is right there, Brett." Jones again tried to say that his grandfather had left, but Lacastro told him, "Brett, you're lying. You need to get out of my yard." At some point during the conversation, Jones told Lacastro that the blood was fake and that "it's a joke." Lacastro responded, "It's not a joke, son. This is not a joke. This is real."

[Jones and Austin then fled on foot.] Lacastro told Jones before he left that he had called the police. After Jones and [Austin] left, Lacastro went over to the bushes where they had been "milling around" and saw an oil pan covered in blood. He then went into the carport and saw more blood, but did not go any farther.

. . . .

Jones and Austin gave the officers false names [when they were apprehended that night]. Officer Gary Turner of Nettleton began a pat-down of Jones and found a pocketknife in his left pocket. Officer Turner asked whether it was the knife Jones "did it with," to which Jones responded, "No, I already got rid of it."

When Investigator Steve White went to investigate the home of Bertis Jones, he found Bertis Jones's body concealed in a utility room in the back of the carport. He found that someone had apparently used a car, an oil pan and a mat to conceal puddles of blood. Investigator White also found a bloodstained

3

T-shirt in the carport, as well as more bloodstained clothing in the kitchen trash can. Officers also found a filet knife in the kitchen sink and a bent steak knife with blood on the tip of it. There were blood spatters on the walls.

There were a total of eight stab wounds to the body of Bertis Jones. There were also abrasions consistent with the body's having been dragged, and cuts on the hand classified as "defensive posturing injuries." The cause of death was a stab wound to the chest.

Jones was convicted of murder in the Circuit Court of Lee County and sentenced to life imprisonment . . . .

*Jones v. State*, 938 So. 2d 312, 313-15 (¶¶2-11) (Miss. Ct. App. 2006) ("*Jones I*").

¶3. By statute, Jones's conviction of a violent offense rendered him ineligible for parole. *See* Miss. Code Ann. § 47-7-3(g) (Rev. 2004). This Court affirmed Jones's conviction and sentence on appeal, and in *Jones v. State*, 122 So. 3d 725 (Miss. Ct. App. 2011) ("*Jones II*"), this Court affirmed the denial of Jones's motion for post-conviction relief.

¶4. After this Court's decision in *Jones II*, the United States Supreme Court held in *Miller v. Alabama* that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. The Court held that the sentencer must have the "discretion" to "consider mitigating circumstances" before a sentence of life without parole may be imposed in such a case. *Id.* at 489. And in *Parker v. State*, 119 So. 3d 987 (Miss. 2013), the Mississippi Supreme Court held that *Miller* applies to the sentencing and parole statutes applicable to deliberate-design murder in this State. *See id.* at 996-97 (¶¶21-23). Therefore, a juvenile offender previously convicted of murder and sentenced to life imprisonment is entitled to a hearing to determine

4

whether he should be deemed eligible for parole based on the mitigating factors discussed in *Miller* and *Parker*. *See id.* at 998-99 (¶¶26-28). Accordingly, in *Jones v. State*, 122 So. 3d 698 (Miss. 2013) ("*Jones III*"), the Mississippi Supreme Court granted Jones post-conviction relief on this issue and remanded the case "for a new sentencing hearing to be conducted consistently with . . . *Parker* [and *Miller*]."

¶5. On remand, the circuit judge appointed counsel for Jones and authorized him to retain an investigator and an expert. The court then held a new sentencing hearing to permit Jones to introduce any evidence that he was entitled to parole eligibility under *Miller* and *Parker*. Jones testified at the hearing and called five additional witnesses: his mother (Enette), his grandmother (Madge), his younger brother (Marty), an aunt, and Jerome Benton, who worked at Walnut Grove Youth Correctional Facility and knew Jones for approximately five years while Jones was incarcerated at that facility. The testimony that Jones presented focused largely on his abusive stepfather (Dan)[1] and his mother's mental health issues.

¶6. Jones, Marty, and Enette all testified that Dan was physically and verbally abusive. Jones testified that the abuse started getting bad when he was about ten or eleven years old. Marty testified that Dan "would get in your face and poke at your chest, poke you in the face, grab you by the arms, grab you by the neck, sling you around and have you sit down, things like that." Sometimes Dan's abuse would leave marks or bruises. Jones and Enette also

---

[1] Jones's mother and father, Tony Jones, separated when Jones was only two years old, and it does not appear that Tony Jones was much of a presence in Jones's life. Jones's mother married Dan in 1999, when Jones was nine or ten years old.

testified that Dan usually referred to Jones and Marty as "little motherfuckers" or "little assholes" rather than by their names.

¶7.    Dan did not hit his stepsons with a closed fist, and Marty testified that there were no "beatings, per se" or any injuries that required medical attention. However, Jones testified that if he talked back, Dan might "reach out and grab [him] by the throat or slam [him] up against the wall by [his] neck or . . . by the front of [his] shirt."

¶8.    A fight between Jones and Dan in the summer of 2004 precipitated Jones's move back to Mississippi to live with his grandparents.[2]  Dan, Enette, Jones, and Marty were living in Florida at the time. Jones testified that he came home late one night, and Dan grabbed him by the throat. Jones then swung at Dan and hit him in the ear. Dan's ear split open and began to bleed, and when the police came, they arrested Jones for domestic violence. As a result, Jones was required to take an anger management course. Jones then moved back to Lee County to live with his grandparents. Jones murdered his grandfather about two months later. There was no evidence that either of Jones's grandparents ever abused or mistreated him.

¶9.    Jones, Marty, and Enette also testified that Enette abused alcohol and had mental health issues during Jones's childhood. Enette testified that she had suffered from depression, bipolar disorder, manic depressive disorder, and a self-injury disorder. Madge testified that Enette would leave Jones and Marty alone and unattended when they were

---

[2] Jones had lived with his grandparents during two prior school years.

young. The family also moved frequently when Jones was young so that he had to change schools frequently.

¶10. Jones testified that he had taken medications for attention deficit hyperactivity disorder (ADHD), depression, and "some kind of psychosis." He also testified that he had issues with cutting himself. However, Jones did not introduce any medical records or offer the testimony of any mental health professional to corroborate his claimed mental health issues. Enette and Madge both testified that Jones was very intelligent, had a high IQ, and had been in gifted classes in school.

¶11. Jones testified that he had been involved in only one significant disciplinary incident while in prison, which involved a fight at Walnut Grove. Jones also testified that he "regret[s]" killing his grandfather.

¶12. Benton testified that Jones worked for him for about five years at Walnut Grove. Jones was approximately age sixteen to age twenty-one during that time. Benton testified that Jones was a good worker, got along with others, stayed out of trouble, and obtained his GED. Benton even said that Jones was "almost like [a] son" to him. Jones never told Benton why he was in prison but only "said he had an accident . . . and did something that he regretted." Benton testified that Jones seemed "normal" and even "mature" for his age and did not exhibit any mental health issues.

¶13. At the conclusion of the hearing, the judge took the matter under advisement. The judge reconvened the proceeding two months later to announce his decision. The judge

7

found that Jones was not entitled to parole eligibility under *Miller*. The judge's on-the-record explanation for his ruling is discussed in more detail below. Because the judge found that Jones was not entitled to relief under *Miller*, he remains ineligible for parole by statute. *See* Miss. Code Ann. § 47-7-3(1)(f) (Rev. 2015). Jones filed a timely notice of appeal.

**ANALYSIS**

¶14. On appeal, Jones makes four arguments, one with two sub-arguments: (I) the circuit judge "failed to comply with the legal standards and procedure mandated by *Miller* . . . and *Parker*" because (A) the judge "failed to apply *Miller*'s presumption against imposing a life-without-parole sentence" and (B) "failed to consider each of the factors required by *Miller* and *Parker*"; (II) he had a constitutional right to a jury at his new sentencing hearing on remand; (III) he has a constitutional right to parole eligibility because he is not irretrievably depraved; and (IV) the United States Constitution and Mississippi Constitution categorically prohibit a sentence of life without parole in all cases in which the offender was under the age of eighteen at the time of the offense.

¶15. Jones's claims (I-A), (II), and (IV) require no new discussion in this case because this Court recently rejected identical claims in *Cook v. State*, No. 2016-CA-00687-COA, 2017 WL 3424877 (Miss. Ct. App. Aug. 8, 2017), *reh'g denied* (Nov. 28, 2017). *See id.* at *5 (¶25) (holding that neither *Miller* nor *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), establishes a "presumption" against a sentence of life without parole; and holding that Mississippi Supreme Court precedent "places the burden on the offender to persuade the

8

judge that he is entitled to relief"); *id.* at \*8-\*9 (¶¶38-44) (holding that there is no constitutional or statutory right to a jury at a "*Miller* hearing"); *id.* at \*9 (¶45) (holding that neither the United States Constitution nor the Mississippi Constitution categorically prohibits a sentence of life without parole in the case of a juvenile convicted of murder).

¶16.    Jones also argues that our appellate standard of review is "heightened scrutiny," as in a death penalty case.  This Court also rejected this argument in *Cook*.  *Id.* at \*5 (¶23).  We reaffirmed what we had "held on two prior occasions": "we review a circuit judge's sentencing decision under *Miller* only for an abuse of discretion."  *Id.* (citing *Hudspeth v. State*, 179 So. 3d 1226, 1228 (¶12) (Miss. Ct. App. 2015); *Davis v. State*, 2016-CA-00638-COA, 2017 WL 2782015, at \*2 (¶8) (Miss. Ct. App. June 27, 2017), *reh'g denied* (Oct. 10, 2017)).  As we explained in *Cook*, we do not "conduct a de novo, appellate resentencing of the offender," nor will we "substitute our own collective view of an appropriate sentence for the considered judgment of the circuit judge, who listened to and observed the demeanor of the witnesses . . . and the offender himself, looked the offender in the eye, and imposed what he adjudged to be a just sentence."  *Id.* at (¶24).  "Rather, our standard of review is abuse of discretion . . . ."  *Id.*

¶17.    Jones also argues that this Court must reverse because the sentencing judge did not make a specific "finding" that he is irretrievably depraved, irreparably corrupt, or permanently incorrigible.  However, this Court also addressed this issue in *Cook*, as did the United States Supreme Court in *Montgomery v. Louisiana*, *supra*.  As this Court explained

9

in *Cook*,

> [I]n *Montgomery*, the Court specifically stated that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility" and that "*Miller* did not impose a formal factfinding requirement."

*Cook*, 2017 WL 342877, at *8 (¶39) (quoting *Montgomery*, 136 S. Ct. at 735). The sentencing judge must consider the factors discussed in *Miller*, and the judge must "apply [those] factors in a non-arbitrary fashion." *Id.* at *6 (¶27). However, the sentencing judge is not required to make any specific "finding of fact."[3]

¶18. We now address Jones's remaining arguments (I-B) that the circuit judge "failed to consider each of the factors required by *Miller* and *Parker*" and (III) that his sentence is unconstitutional because he is not irretrievably depraved. For the reasons that follow, we hold that the circuit judge complied with the holdings and requirements of *Miller*, *Montgomery*, and *Parker* and the mandate in *Jones III*. In addition, the judge's ultimate sentencing decision was neither arbitrary nor an abuse of discretion.

¶19. In *Parker*, our Supreme Court made clear that "*Miller* does not prohibit sentences of

---

[3] *Accord, e.g.*, *Garcia v. State*, 903 N.W.2d 503, 512 (¶26) (N.D. 2017) ("*Miller* did not impose a formal factfinding requirement . . . . *Miller* 'mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty.'"); *Jones v. Commonwealth*, 795 S.E.2d 705, 709 n.3 (Va. 2017) ("*Montgomery* acknowledged that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility' and 'did not impose a formal factfinding requirement' on this mitigation issue."); *People v. Holman*, 58 N.E.3d 632, 642-43 (¶¶37-38) (Ill. App. Ct. 2016) (same), *aff'd*, 2017 WL 4173340 (Ill. Sept. 21, 2017); *Brown v. State*, No. W2015-00887-CCA-R3-PC, 2016 WL 1562981, at *7 (Tenn. Crim. App. Apr. 15, 2016) (unpublished op.) ("[*Montgomery*] reiterated that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility'"), *appeal denied* (Tenn. Aug. 19, 2016), *cert. denied*, 137 S. Ct. 1331 (2017).

life without parole for juvenile offenders. Rather, it 'requires the sentencing authority to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Parker*, 119 So. 3d at 995 (¶19) (quoting *Miller*, 567 U.S. at 480). As the *Parker* Court explained, *Miller* "identified several factors" that the judge should consider before in determining whether a sentence of life without parole is unconstitutional. *Id.* These include:

- the offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences";

- "the family and home environment that surrounds [the offender]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional";

- "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"

- whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and

- "the possibility of rehabilitation."

*Id.* at 995-96 (¶19) (quoting *Miller*, 567 U.S. at 478). The *Miller* Court predicted that "appropriate occasions for sentencing juveniles" to life without parole would "be uncommon." *Miller*, 567 U.S. at 479. Subsequently, in *Montgomery*, the Supreme Court stated that this sentence would be "disproportionate . . . for all but the rarest of children,

11

those whose crimes reflect 'irreparable corruption.'" *Montgomery*, 136 S. Ct. at 726 (quoting *Miller*, 567 U.S. at 479-80).

¶20.    On remand in the present case, the circuit judge appointed counsel for Jones and authorized him to retain an investigator and an expert. The judge then held a new sentencing hearing at which Jones was permitted to introduce any evidence relevant to the factors discussed in *Miller*. The judge then considered whether Jones was entitled to parole eligibility under *Miller*. The judge began his ruling from the bench as follows:

> I'm going to read into the record a long dissertation about the facts and circumstances in this case, as much as anything to demonstrate that I have considered each and every factor that is identifiable in the *Miller* case and its progeny and those decisions which followed. When I've done that, then we will proceed with the imposition of sentence . . . .
>
> . . . .
>
> This cause is before the Court for resentencing in accord with the dictates of *Miller versus Alabama*.
>
> . . . [T]he Court conducted a hearing and heard evidence offered by [Jones] and the State . . . bearing on those factors to be considered by the Court as identified by *Miller*. The ultimate question is whether or not, in consideration of those factors, . . . relief is appropriate [on] the facts and circumstances in this case.
>
> . . . .
>
> The Court is cognizant of the fact that children are generally different; that consideration of the *Miller* factors and others relevant to the child's culpability might well counsel against irrevocably sentencing a minor to life in prison. All such factors must be considered on a case-by-case basis.
>
> *Miller* requires that the sentencing authority consider both mitigating and the aggravating circumstances. And I would note that these are not really terms

12

used in the *Miller* opinion, but I think they are an easy way for us to identify those considerations.

This Court can hypothesize many scenarios that would warrant and be just to impose a sentence which would allow the defendant to be eligible for consideration for parole, notwithstanding the parole law . . . .

¶21. The judge then discussed that the jury at Jones's trial was properly instructed on his defense of self-defense, the lesser-included offense of manslaughter, and the difference between murder and manslaughter; however, the jury returned a unanimous verdict finding Jones guilty of deliberate-design murder.[4] The court discussed that a "fair consideration of the evidence" showed that Jones committed a "particularly brutal" murder. Jones "stabbed [his grandfather] eight times and was forced to resort to a second knife when the first knife broke while used in the act." Jones then "attempted to conceal" his crime by hiding his grandfather's body and trying to wash away a "great amount of blood" with a water hose.

¶22. The judge also found that there was no evidence that Jones was under any sort of family or peer pressure to commit the crime. The judge did find that Jones "grew up in a troubled circumstance," but he also found that there was "no evidence of brutal or inescapable home circumstances." As the judge stated, Jones's grandfather had "provide[d] him with a home away from" his troubled family environment in Florida. *See Miller*, 567

---

[4] The sentencing judge, who also presided over Jones's trial, took into account the testimony and evidence from Jones's trial. As discussed above, Jones's girlfriend testified at trial that earlier on the day of the murder, Jones did not respond when she asked him whether he was going to kill his grandfather, and Jones did say that "he was going to hurt his granddaddy." *Jones I*, 938 So. 2d at 313-14 (¶2).

13

U.S. at 477 (stating that the sentencer should consider the juvenile defendant's "family and home environment . . . *from which he cannot usually extricate himself*" (emphasis added)).

¶23. The judge concluded by stating: "the Court, **having considered each of the *Miller* factors**, finds that the defendant, Brett Jones, does not qualify as a minor . . . entitled to be sentenced in such manner as to make him eligible for parole consideration."

¶24. The circuit judge in this case held the hearing required by *Miller*. The judge did not specifically discuss on the record each and every factor mentioned in the *Miller* opinion. However, the judge expressly stated that he had "considered each of the *Miller* factors." Neither the United States Supreme Court nor the Mississippi Supreme Court has held that reversal is required just because the sentencing judge omits some factors from his on-the-record discussion of the reasons for the sentence. The judge's bench ruling was sufficient to explain the reasons for the sentence. The judge recognized the correct legal standard ("the *Miller* factors"), his decision was not arbitrary, and his findings of fact are supported by substantial evidence. Therefore, the judgment of the circuit court is affirmed. *See Cook*, 2017 WL 3424877, at *5-*6 (¶¶23-24, 27).

## CONCLUSION

¶25. The decision of the circuit court denying Jones's request for parole eligibility is affirmed.

¶26. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE AND TINDELL, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND**

14

**DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶27. I agree with the majority's finding that Jones was not entitled to be resentenced by a jury. The Mississippi Supreme Court has found that "a trial judge may impose the sentence enhancement once the jury has found all of the facts necessary to satisfy the elements of the sentencing-enhancement statute." *Taylor v. State*, 137 So. 3d 283, 287 (¶14) (Miss. 2014). However, I am of the opinion that the trial court did not conduct a thorough on-the-record analysis to determine whether Jones was among the "very rarest of juvenile offenders who is irreparably corrupt, irretrievably broken, and incapable of rehabilitation," which I would find is required under *Miller*. Accordingly, I would reverse Jones's sentence of life without parole and remand to the trial court for resentencing. Therefore, I respectfully dissent.

¶28. Under *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), before a juvenile homicide offender is sentenced to life without the possibility of parole, the trial court must make a specific finding that the juvenile offender's actions reflect a transient immaturity or that the juvenile is irreparably corrupt, permanently incorrigible, and cannot be rehabilitated.[5]

¶29. Mississippi Code Annotated section 97-3-21 (Rev. 2006) requires a minimum of life

---

[5] In the supplemental briefs submitted to this Court, both Jones and the State agree that *Montgomery* required an on-the-record hearing in which Jones could present proof that he was not irreparably corrupt and permanently incorrigible. The State, however, claims that the Court conducted a sufficient hearing.

in prison without parole regardless of an offender's age. However, in *Miller*, the United States Supreme Court held that the sentencing authority must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480. The factors that should be considered include chronological age and its hallmark features, family and home environment, circumstances of the homicide offense, and the possibility of rehabilitation. *Id.*

¶30.    Following the High Court's pronouncement in *Miller*, our state Supreme Court decided *Parker v. State*, 119 So. 3d 987 (Miss. 2013).[6] In *Parker*, a fifteen-year-old was convicted of the murder of his grandfather. *Parker*, 119 So. 3d at 988 (¶1). "He was sentenced to serve the remainder of his natural life in the custody of the Mississippi Department of Corrections." *Id.* (internal quotation marks omitted). Parker appealed his sentence, citing the High Court's ruling in *Miller*.

¶31.    Our Supreme Court announced that **all** *Miller* factors must be considered before a trial court may sentence a juvenile homicide offender to life imprisonment. *See Parker*, 119 So. 3d at 996 (¶19) (citing *Miller*, 567 U.S. at 477-78). The Court also opined that the mandatory consideration of the *Miller* factors provided "the trial court with a stopgap mechanism to annul the application of" mandatory life in prison without the possibility of parole for juvenile homicide offenders. *Id.* at 999 (¶27). *Parker* did not foreclose the sentencer's

---

[6] The trial court made no mention of *Parker v. State* in its resentencing order although the Mississippi Supreme Court specifically directed the court to resentence Jones in accordance with *Parker* and *Miller*.

16

ability to sentence the juvenile homicide offender to life in prison without the possibility of parole. However, *Parker* also made a point to acknowledge that "this . . . punishment disregards **the possibility of rehabilitation** even when the circumstances most suggest it." *Id.* at 996 (¶19) (emphasis added) (quoting *Miller*, 567 U.S. at 478).

¶32. Following *Parker*, this Court decided *Thomas v. State*, 130 So. 3d 157 (Miss. Ct. App. 2015). In *Thomas*, a seventeen-year-old was an accomplice to a store robbery. *Id*. at 158 (¶3). His partner shot and killed one of the store employees and wounded the other, while Thomas remained in the vehicle. *Id*. Thomas pled guilty to one count of capital murder and one count of aggravated assault, and was sentenced to life imprisonment without parole and a twenty year sentence for aggravated assault, to run consecutively. *Id*. We vacated Thomas's sentence and remanded his case for resentencing following an on-the-record consideration of the *Miller* factors. *Id*. at 159-60 (¶13). We also reiterated *Miller* and *Parker*'s finding that "[w]e do not foreclose a sentencer's ability" to sentence a juvenile homicide offender to life without the possibility of parole. *Id*.

¶33. More than a year after *Thomas*, we decided *Hudspeth v. State*, 179 So. 3d 1226 (Miss. Ct. App. 2015). Hudspeth, also a juvenile homicide offender, was sentenced to life in prison without parole. *Id*. at 1227 (¶3). Hudspeth filed a motion in the trial court to vacate his sentence following *Miller*. "The trial court granted the motion to vacate Hudspeth's sentence and held a hearing using the factors enunciated in *Miller* to determine whether the mandatory life sentence was to be served with or without parole." *Id.* at 1226-27 (¶2). The trial court

considered the issue of rehabilitation on the record and enunciated its ruling after hearing testimony on that pertinent concern. *Id*. at 1228 (¶10). Nevertheless, "[t]he trial court resentenced Hudspeth to life without the possibility of parole." *Id.* at 1227 (¶3).

¶34. On appeal, we found that the trial court did not abuse its discretion in sentencing Hudspeth to life without parole, because the trial court analyzed the *Miller* factors and failed to find compelling mitigating factors. *Id* at 1228 (¶12) . However, the U.S. Supreme Court recently opined that "*Miller* did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole." *Montgomery*, 136 S. Ct. at 734.

¶35. This Court was also faced with the application of the *Miller* factors in *Cook v. State*, 2016-CA-00687-COA, 2017 WL 3424877, at *4 (¶19) (Miss. Ct. App. Aug. 8, 2017). The trial judge in *Cook* not only appointed new counsel but also appointed Dr. Criss Lott to conduct a mental evaluation of Cook. *Id*. Like the investigator in *Hudspeth*, Dr. Lott offered testimony after his evaluation of Cook, with particular attention to the *Miller* factors. *Id*.

¶36. So even with the application of *Cook* in this case, the sentence should be reversed, because the trial judge abused his discretion in not conducting a thorough and an adequate *Miller* analysis regarding the "possibility of rehabilitation." *See Cook*, 2017 WL 3424877, at *8 (¶35).

¶37. The majority notes that the sentencing judge is required to consider the factors discussed in *Miller* and to "apply those factors in a non-arbitrary fashion." Maj. Op. at (¶17) (citing *Cook*, 2017 WL 342877, at *6 (¶27)). However, the majority also states that "the

18

judge did not specifically discuss on the record each and every factor mentioned in the *Miller* opinion." Maj. Op. at (¶24). As a result, I would find that the judge's *Miller* analysis omitted a crucial determination regarding whether Jones could be rehabilitated.[7] Thus, I would find that the omission does not comply with *Miller*.

¶38. The majority further notes that in *Cook*, this Court held that "[i]n *Montgomery*, the Court specifically stated that '*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility' and that *Miller* did not impose a formal factfinding requirement." Maj. Op. at (¶17) (quoting *Cook*, 2017 WL 3424877, at *8 (¶39) (quoting *Montgomery*, 136 S. Ct. at 735)). Although the majority notes that *Miller* did not impose a formal factfinding requirement, *Miller* does not discourage it either. The entire purpose of conducting a proper *Miller* analysis is to determine whether a juvenile defendant represents the rare[8] juvenile offender who exhibits such irretrievable depravity and permanent incorrigibility that rehabilitation is impossible and life without parole is justified.

¶39. The U.S. Supreme Court went a step further in requiring a thorough *Miller* analysis in *Montgomery*. There, a juvenile homicide offender was seventeen years old when he killed a deputy sheriff in Louisiana. *Montgomery*, 136 S. Ct. at 725. He was sentenced to life in prison without the possibility of parole. *Id*. After the High Court announced *Miller*,

---

[7] Judicial prudence dictates that if courts treat matters regarding civil parental custody of juveniles with such caution, then courts should also be as thorough when evaluating state custody juvenile offenders who face life without the possibility of parole.

[8] I am of the opinion that the terms "rare" and "rarest" refer to the "exclusive" group of juvenile offender who are irretrievably depraved and permanently incorrigible.

19

Montgomery appealed his sentence to Louisiana's lower courts. *Id*. at 726. However, his motion was denied. Before Montgomery could appeal to the Louisiana Supreme Court, the court held that *Miller* did not apply retroactively. *Id*. As a result, the Louisiana Supreme Court denied Montgomery's supervisory writ. *Id*.

¶40. Montgomery appealed to the U.S. Supreme Court, which held that "sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption." *Montgomery*, 136 S. Ct. at 734. The High Court expanded *Miller*'s reach in *Montgomery* by finding "life without parole [to be] an unconstitutional penalty for a class of defendants because of their status . . . [as] juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* (quotation marks omitted).

¶41. Further, in *Montgomery,* the U.S. Supreme Court announced that *Miller* established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." *Id.* The High Court explained that "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment if the child's crime reflects unfortunate, yet transient immaturity." *Id.* at 734 (quoting *Miller*, 567 U.S. at 479). Therefore, *Miller* announced a substantive rule of constitutional law, curtailing the imposition of mandatory life sentences without the possibility of parole for minors without specific findings of fact.

¶42. Following *Montgomery*'s clarification of *Miller*, state appellate courts have recognized that a juvenile homicide offender may not be sentenced to life without parole

20

unless a sentencer first makes a properly informed finding that he is irreparably corrupt. *See Veal v. State*, 784 S.E. 2d 403, 412 (Ga. 2016); *Luna v. State*, 387 P.3d 956, 963 (Okla. Crim. App. 2016); *Landrum v. State*, 192 So. 3d 459, 469 (Fla. 2016). Therefore, a necessary prerequisite for imposing a life-without-parole sentence on a juvenile is a specific finding that the juvenile is irreparably corrupt. The sentencer must make a finding whether a particular child is "the rare juvenile offender who exhibits such irretrievably depravity that rehabilitation is impossible and life without parole is justified." *Montgomery*, 136 S. Ct. at 733.

¶43. In *Tatum v. Arizona*, 137 S. Ct. 11 (2016), the U.S. Supreme Court *granted* writs of certiorari, *vacated* judgments, and *remanded* (GVR) a number of cases for further consideration following *Montgomery*'s clarification of *Miller*.[9] Though the Court voted to GVR several cases, it did not issue a written explanation of how state courts should adjudicate juvenile-homicide-offender cases. Justice Sotomayor concurred in *Tatum*, where she discussed the failure of sentencing judges to address the question *Miller* and *Montgomery* require, "[that] a sentencer . . . ask . . . whether the petitioner was among the very rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Tatum*, 137 S. Ct. at 12 (Sotomayor, J., concurring in the decision to grant, vacate, and remand) (quotation

---

[9] In our order for supplemental briefing, we asked the parties to address what authoritative precedential value a GVR has, or is it advisory, in light of *Montgomery*. Both parties agree that the GVRs are nonbinding. We agree that it is merely advisory and our analysis need not go any further.

marks omitted) (citing *Montgomery*, 136 S. Ct. at 734).

¶44. While the court took into account most mitigating and aggravating circumstances, the trial judge still failed to analyze on the record whether Jones was among the very "rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* In *Tatum*, 137 S. Ct. at 12, Justice Sotomayor wrote the following:

> Children are constitutionally different from adults for purposes of sentencing in light of their lack of maturity and under-developed sense of responsibility, their susceptibility to negative influences and outside pressure, and their less well-formed character traits. Failing to consider these constitutionally significant differences . . . poses too great a risk of disproportionate punishment.

(Internal citations and quotations marks omitted).

¶45. At Jones's resentencing hearing, the trial court found that Jones's actions of being intimate with his girlfriend and getting her pregnant evinced a degree of maturity "at least in one area." Jones brought forth testimony that he was on antidepressants as well as other medications for ADHD and psychosis. However, in assessing Jones's level of maturity, the court failed to address Jones's mental health and whether sufficient evidence was presented relative thereto. The court discussed the manner in which Jones murdered his grandfather and Jones's attempt to conceal his grandfather's death. The court held that there was no evidence that Jones was abused by his grandfather or pressured by a family member or peer to harm his grandfather. The court found no mitigating factors of Jones's childhood that prohibited a life-without-parole sentence.

¶46. However, during the resentencing hearing, the trial judge noted Jones's abusive

22

childhood. Several witnesses testified on Jones's behalf, including his paternal grandmother, the wife of the victim. Jones presented a number of mitigating factors to substantiate his assertion that he should be sentenced as a juvenile.[10] The trial court heard the testimony and found that it was not compelling enough to sentence Jones to less than life imprisonment without parole.

¶47. I find the trial court failed to make a finding on the record as to whether Jones is among the *rarest* of juvenile offenders under *Miller* and *Montgomery*. Therefore, I would find that before a juvenile homicide offender may be sentenced to life in prison without the possibility of parole, a sentencing authority must make specific on-the-record findings of fact that illustrate that he is among the very rarest of juvenile offenders who are irreparably corrupt, irretrievably broken, and incapable of rehabilitation.

¶48. For the above reasons, I would reverse and remand to the trial court for resentencing.

**LEE, C.J., JOINS THIS OPINION.**

---

[10] Jones raised his mental health as a mitigating factor but presented no medical or prescription records or expert testimony to substantiate the same.

23