No. 121,815

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RONELL WILLIAMS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

The Eighth Amendment to the United States Constitution prohibits a mandatory sentencing scheme that includes a punishment of life in prison without the possibility of parole for a juvenile homicide offender if the sentencing process does not give the sentencing court discretion to consider a juvenile offender's youth and individual attendant characteristics as part of the sentencing process.

2.

The constitutional protections afforded under *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), are triggered regardless of whether a sentencing scheme is mandatory or discretionary.

3.

The constitutional protections afforded under *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), are triggered when a juvenile offender convicted of premeditated first-degree murder is subject to a sentence for a term of years that is the functional equivalent to a sentence of life without parole.

1

4.

A hard 50 term of years sentence is the functional equivalent to a sentence of life without parole for purposes of applying the constitutional protections afforded juvenile homicide offenders under *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

5.

In deciding whether imposition of a hard 50 sentence on a juvenile offender convicted of premediated first-degree murder is constitutionally disproportionate in violation of the Eighth Amendment to the United States Constitution, the sentencing court must consider the offender's youth and attendant characteristics, including the child's diminished culpability and heightened capacity for change.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed October 9, 2020. Reversed, sentence vacated in part, and case remanded with directions.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., HILL and ATCHESON, JJ.

STANDRIDGE, J.: Ronell Williams committed a very serious, violent crime when he was 14 years old and, as a result, was convicted of two counts of premeditated first-degree murder arising from the death of two victims. He is serving two concurrent life sentences without the possibility of parole for 50 years (hard 50). Williams will spend at least a half century in jail before he is eligible to be considered for release.

2

When the sentences originally were imposed, the trial judge did not consider the characteristics and circumstances attendant to Williams' age. In the past decade, however, the United States Supreme Court sent a clear message in that regard: "children are different" when it comes to sentencing, and "youth and its attendant characteristics" must be considered at the time a juvenile is sentenced to life imprisonment without the possibility of parole. *Miller v. Alabama*, 567 U.S. 460, 465, 480, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The Supreme Court recognized the mitigating qualities of youth and directed that judges in those cases consider a number of factors at sentencing, including immaturity and "failure to appreciate risks and consequences"; "family and home environment"; family and peer pressures; an "inability to deal with police officers or prosecutors" or the juvenile's own attorney; and "the possibility of rehabilitation." 567 U.S. at 477-78. The *Miller* Court ultimately held that that the Eighth Amendment to the United States Constitution prohibits a mandatory sentencing scheme that includes a punishment of life in prison without the possibility of parole for a juvenile offender who has been convicted of homicide if the sentencing process does not give the sentencing court the discretion to consider a juvenile offender's youth and individual attendant characteristics as part of the sentencing process. 567 U.S. 489.

Citing *Miller* and the sentencing court's failure to consider the characteristics and circumstances attendant to his age, Williams brings this K.S.A. 60-1507 motion challenging his hard 50 sentence as constitutionally disproportionate under the Eighth Amendment. In response, the State argues the holding in *Miller* is inapplicable to the facts of this case because Williams' hard 50 sentence is not equivalent to life without parole and was imposed under a discretionary sentencing scheme. For the reasons stated below, however, we hold (1) the constitutional protections afforded under *Miller* are triggered regardless of whether the sentencing scheme is mandatory or discretionary, (2) Williams' hard 50 sentence is the functional equivalent of a sentence of life without parole for purposes of the constitutional protections in *Miller*, and (3) Williams was deprived of the constitutional guarantees afforded under *Miller* because the sentencing

3

court failed to fully consider his diminished culpability and heightened capacity for change before imposing the hard 50 sentence on him. As a result, we reverse and remand the case, with specific directions, for resentencing on the premeditated first-degree murder convictions. We also vacate the part of Williams' sentence imposing lifetime postrelease supervision.

FACTS

Highly summarized, the essential facts presented at trial to support the underlying criminal charges against Williams are fairly straightforward. On August 3, 1999, Williams and his twin brother, age 14, stole a gun from a residence and walked away from the crime. After proceeding about a block, they saw Wilbur Williams in his front yard on the way to his mailbox. The brothers forced Wilbur back inside his house where they held him and his wife Wilma prisoner while searching the house for items to steal. Williams' twin brother left the house to drive the victim's vehicle around to the front of the house. While his brother was moving the vehicle, Williams shot and killed Wilbur and Wilma. The victims are not related to the brothers.

The district court authorized the State to prosecute Williams as an adult pursuant to K.S.A. 1999 Supp. 38-1636(f)(1), and a jury later convicted Williams of two counts premeditated first-degree murder, one count aggravated robbery, and one count aggravated burglary. The default sentence for premeditated first-degree murder was life without the possibility of parole for 25 years (hard 25). See K.S.A. 1999 Supp. 21-4706(c); K.S.A. 1999 Supp. 22-3717(b)(1). The sentence was enhanced to a hard 50 sentence if the sentencing judge found that one or more aggravating circumstances existed and that the aggravators were not outweighed by mitigating circumstances. K.S.A. 1999 Supp. 21-4635(c). After hearing the arguments of counsel and the statements from individuals in support of Williams and from the victims' family, the court found that one or more of the statutory aggravating circumstances existed and that

4

the aggravating circumstances were not outweighed by any existing mitigating circumstances. For each of the two first-degree murder charges, the district court imposed a hard 50 sentence. The court also imposed lifetime postrelease supervision. For the aggravated robbery and aggravated burglary convictions, the district court sentenced Williams to 59 months and 32 months, respectively. The court ordered all four sentences to run concurrently. Our Supreme Court affirmed Williams' convictions and sentences on March 19, 2004. *State v. Williams*, 277 Kan. 338, 85 P.3d 697 (2004).

On March 15, 2005, Williams filed his first motion for relief under K.S.A. 60-1507. See *Williams v. State*, No. 99,516, 2009 WL 1140260 (Kan. App. 2009) (unpublished opinion). In it, Williams claimed his trial counsel was ineffective for failing to request a postinterview report from Dr. Jan Roosa, a clinical psychologist who testified on his behalf at trial. Williams argued counsel's deficient performance prejudiced him by severely limiting Dr. Roosa's ability to testify fully about his expert opinion. The district court held an evidentiary hearing but ultimately denied Williams relief, finding he failed to show that, but for counsel's deficient performance, the result of the trial would have been different. A panel of our court affirmed. See 2009 WL 1140260, at *8.

In 2012, the United States Supreme Court held in *Miller*, 567 U.S. at 489, that the Eighth Amendment prohibits a mandatory sentencing scheme that includes a punishment of life in prison without the possibility of parole for a juvenile offender who has been convicted of homicide if the sentencing process does not give the sentencing court the discretion to consider a juvenile offender's youth and individual attendant characteristics as part of the sentencing process. In 2016, the United States Supreme Court decided *Montgomery v. Louisiana*, 577 U.S. __, 136 S. Ct. 718, 732, 193 L. Ed. 2d 599 (2016), which held that the legal principles announced in *Miller* are substantive and therefore retroactive in cases on collateral review.

5

On September 30, 2016, Williams filed a second pro se K.S.A. 60-1507 motion claiming the sentencing structure under which his hard 50 sentence was imposed violated *Miller*, which means his sentence is now unconstitutional under the Eighth Amendment. Specifically, Williams argued that because his hard 50 sentence is the practical equivalent of a life sentence without parole and it was imposed under a mandatory sentencing scheme, the constitutional findings in *Miller* require that his sentence be vacated and the case remanded so the court can consider his youth and attendant characteristics before resentencing him. The district court did not reach the merits of Williams' argument and dismissed the habeas motion as untimely and successive.

ANALYSIS

Williams claims the district court erred by summarily denying his motion on procedural grounds because he sufficiently established the manifest injustice and exceptional circumstances necessary to justify his untimely and successive filing. Assuming we find in his favor on this procedural claim of error, Williams asks us to find in his favor on the merits of his claims: that his hard 50 sentence must be vacated and the matter remanded for a new sentencing hearing with directions for the court to consider his youth and its attendant characteristics as set forth in *Miller* before imposing a new sentence. Williams also claims the district court erred by imposing lifetime postrelease supervision as part of his sentence for the premeditated first-degree murder convictions. We address each of Williams' claims in turn.

A. *Summary dismissal on procedural grounds*

The district court summarily denied Williams' K.S.A. 60-1507 motion on procedural grounds, finding the 2016 motion was successive to his 2005 habeas corpus motion and untimely filed. See K.S.A. 2019 Supp. 60-1507(c), (f). But Williams argues that the Supreme Court's decision in *Miller* is an intervening change in the law that

6

constitutes an exceptional circumstance justifying our consideration of a successive motion. Williams also argues that the one-year time limit should be extended by the court to prevent a manifest injustice; specifically, that the untimely nature of his motion should be excused because *Miller*—the case providing substantive support for the 60-1507 claim that his sentence constitutes cruel and unusual punishment—was not decided until 2012 and was not given retroactive effect until the Supreme Court decided *Montgomery* in 2016.

1. *Exceptional circumstances*

When a district court summarily denies a K.S.A. 60-1507 motion, appellate review of that ruling is de novo. See *Thuko v. State*, 310 Kan. 74, 80, 444 P.3d 927 (2019). The interpretation of statutes and Supreme Court rules involves questions of law reviewable de novo. *Stewart v. State*, 310 Kan. 39, 43, 444 P.3d 955 (2019).

A court is not required to entertain successive motions for similar relief on behalf of the same prisoner. K.S.A. 2019 Supp. 60-1507(c). Nevertheless, our Supreme Court "has decades of caselaw holding that K.S.A. 60-1507's prohibition on successive motions is subject to exceptions." *Nguyen v. State*, 309 Kan. 96, 107, 431 P.3d 862 (2018). "To avoid having a second or successive K.S.A. 60-1507 motion dismissed as an abuse of remedy, the movant must establish exceptional circumstances." *Beauclair v. State*, 308 Kan. 284, 304, 419 P.3d 1180 (2018). But cf. *Nguyen*, 309 Kan. at 108 ("[A] plain reading of [Supreme Court Rule 183(d) on successive motions] would suggest that a district court is permitted to decline to consider a successive motion *only* 'when . . . justice would not be served by reaching the merits of the subsequent motion.'"). See Supreme Court Rule 183(d) (2020 Kan. S. Ct. R. 223). "'Exceptional circumstances are unusual events or intervening changes in the law that prevented the defendant [from] raising the issue in a preceding [K.S.A.] 60-1507 motion.' The burden to make such a showing lies with the movant. [Citations omitted.]" *Beauclair*, 308 Kan. at 304.

7

Applying the legal principles set forth in *Beauclair* to the facts here, we necessarily conclude that the Supreme Court's decisions in *Miller* and *Montgomery* are intervening changes in the law under which Williams can now claim an error affecting his constitutional rights and therefore constitute exceptional circumstances justifying our consideration of Williams' second K.S.A. 60-1507 motion. See *Dunlap v. State*, 221 Kan. 268, 270, 559 P.2d 788 (1977). Given Williams could not have raised a claim that his hard 50 sentence was cruel and unusual punishment until 2016—after *Montgomery* made *Miller* retroactive—we also conclude that justice would be served by reaching the merits of the motion, which excludes his successive claim from the requirement in Rule 183(d) that the court not consider it. See Rule 183(d) (court may not consider second or successive motion for relief by same movant when ground for relief was determined adversely to movant on merits in prior motion and when justice would not be served by reaching merits of subsequent motion); see also *Littlejohn v. State*, 310 Kan. 439, 444-45, 447 P.3d 375 (2019) (whether justice would be served by reaching merits of successive motion is part of statutorily driven analysis of whether exceptional circumstances exist).

2. *Manifest injustice*

The mandate in Williams' direct appeal was issued on April 15, 2004. Williams filed his second habeas motion in September 2016, well past the one-year time limit. The one-year time limit "may be extended by the court only to prevent a manifest injustice." K.S.A. 2019 Supp. 60-1507(f)(2). Effective July 1, 2016, the Legislature amended subsection (f)(2) and limited the factors a court may consider when determining whether the manifest injustice exception applies to "(1) a movant's reasons for the failure to timely file the motion . . . or (2) a movant's claim of actual innocence." *White v. State*, 308 Kan. 491, 496, 421 P.3d 718 (2018). We apply the amended statute to Williams because it was in effect when he filed his second habeas motion.

8

Williams argues his reason for failing to file a timely motion establishes the required manifest injustice. The following chronology is relevant to Williams' argument:

- On June 25, 2012, the United States Supreme Court decided *Miller*, which held that mandatory life imprisonment without parole for offenders who committed homicide crimes as juveniles violates the Eighth Amendment's prohibition on cruel and unusual punishments.

- On June 5, 2015, the Kansas Supreme Court applied *Miller* to a case on direct appeal, holding that mandatory lifetime postrelease supervision for juveniles who have committed and are later convicted of aggravated indecent liberties categorically constitutes cruel and unusual punishment. See *State v. Dull*, 302 Kan. 32, 35, 351 P.3d 641 (2015).

- On January 27, 2016, the United States Supreme Court decided *Montgomery*, which held that *Miller* applies retroactively on collateral review of a prisoner's sentence.

- On September 30, 2016, Williams filed his second K.S.A. 60-1507 motion.

From this chronology, we can see that Williams filed his second K.S.A. 60-1507 motion a little over eight months after the United States Supreme Court ruled that the holding in *Miller* applied retroactively and could be raised by a prisoner in a collateral attack of his or her sentence. Williams claims his motion must be considered on the merits to prevent a manifest injustice because he filed it less than one year after relief on his claim became a viable option. We agree and find the facts here present the rare and extraordinary circumstances that justify extending the one-year time limit to prevent a manifest injustice. See K.S.A. 2019 Supp. 60-1507(f)(2); *Beauclair*, 308 Kan. at 302

9

(Kansas' manifest injustice exception to procedural bar based on untimeliness should remain rare and be applied only in the extraordinary case).

In sum, we conclude that the intervening change in the law as set forth in *Miller* and made retroactive in *Montgomery* constitutes a manifest injustice and extraordinary circumstances to justify the untimely and successive nature of Williams' motion under the specific facts presented in this case. Based on our conclusion, we move on to consider the merits of Williams' substantive claims for relief.

B. *The constitutionality of Williams' hard 50 sentence under the rule in* Miller

Williams claims his hard 50 sentence violates the Eighth Amendment's prohibition on cruel and unusual punishments because it was imposed under a sentencing structure that has since been deemed unconstitutional under *Miller*. To provide the proper context for our analysis of Williams' arguments, we start by reviewing the evolution of United States Supreme Court caselaw on issues relating to life sentences for juvenile offenders.

In 1988, the Supreme Court held that the execution of a person under the age of 16 violated the Eighth Amendment's prohibition against cruel and unusual punishment. *Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S. Ct. 2687, 101 L. Ed. 2d 702 (1988). The Court explained that "contemporary standards of decency" inform against executing a person who was under 16 years of age at the time of his or her offense. 487 U.S. at 823. In addition to societal standards, the Court also relied on its past cases for the proposition that adolescents as a class are less mature and responsible than adults; therefore, less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult. 487 U.S. at 835.

In 1989, the Supreme Court again referred to contemporary "standards of decency" but came to a different conclusion in holding that the execution of persons who

10

were 16 or 17 years old at the time of their offense did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Stanford v. Kentucky*, 492 U.S. 361, 380, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989). In support of its conclusion, the *Stanford* Court stated it was not persuaded by evidence that 16- and 17-year-old juveniles possess less developed cognitive skills than adults, are less likely to fear death, or are less mature and responsible. Accordingly, the Court held juveniles who committed crimes when in this narrow age group were as morally blameworthy as adults. 492 U.S. at 377-78.

In 2005, the Supreme Court overruled *Stanford* and held that the Eighth Amendment's prohibition against "cruel and unusual punishments" categorically precludes the Court from imposing the death penalty on juveniles who committed the offense charged when they were less than 18 years old. *Roper v. Simmons*, 543 U.S. 551, 578-79, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). In support of its holding, the Court pointed to evidence of a developing consensus among the states of "evolving standards of decency" indicating that society had become opposed to the death penalty when the offender was under the age of 18. 543 U.S. at 561, 564-75. The Court found the source of this consensus was rooted in the undisputed and long held belief that there are major differences between juveniles and adults. The Court found persuasive certain scientific studies examining common characteristics of juvenile offenders. From these studies, the Court recognized that juveniles typically possess three characteristics that make them different than adults and, consequently, less blameworthy:  juveniles often are more impetuous and reckless, they often are more vulnerable to negative influences and peer pressure, and their traits are more transitory and less fixed. 543 U.S. at 569-70. In light of these characteristics, the Court held the usual sentencing justifications for the death penalty—retribution and deterrence—did not provide adequate justification for imposing the death penalty on juvenile offenders. 543 U.S. at 571-72. The Court concluded that the differences between juveniles and adults "are too marked and well understood to risk

11

allowing a youthful person to receive the death penalty despite insufficient culpability." 543 U.S. at 572-73.

In 2010, the Supreme Court extended its reasoning in *Roper* to overturn the sentence of a juvenile offender sentenced to life imprisonment without parole. *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Unlike the holding in *Roper*, the *Graham* Court did not conclude that this punishment was unconstitutional for all juvenile offenders. Instead, the Court drew a distinction between juveniles convicted of homicide and those convicted of offenses other than homicide. The Court held that a sentence of life without parole violates the Eighth Amendment only when imposed on a juvenile offender who *did not* commit homicide. *Graham*, 560 U.S. at 82. In doing so, the Court applied the categorical approach to assess the limits of what constitutes cruel and unusual punishment under the Eighth Amendment.

The *Graham* Court acknowledged that its cases previously had considered two distinct subsets when adopting categorical rules to define Eighth Amendment standards: "one considering the nature of the offense, the other considering the characteristics of the offender." 560 U.S. at 60.

> "With respect to the nature of the offense, the Court has concluded that capital punishment is impermissible for nonhomicide crimes against individuals. In cases turning on the characteristics of the offender, the Court has adopted categorical rules prohibiting the death penalty for defendants who committed their crimes before the age of 18, or whose intellectual functioning is in a low range. [Citations omitted.]" 560 U.S. at 60-61.

The *Graham* Court began its categorical Eighth Amendment proportionality analysis by looking to "'the evolving standards of decency that mark the progress of a maturing society.'" 560 U.S. at 58, 62. In addition to evolving standards of decency, the Court held an Eighth Amendment proportionality analysis must also include "consideration of the culpability of the offenders at issue in light of their crimes and

12

characteristics, along with the severity of the punishment in question. In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals." 560 U.S. at 67. The Court reiterated its analysis in *Roper* that juveniles have "lessened culpability" in comparison to adults. 560 U.S. at 68. Noting that developments in psychology and brain science continued to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control—the Court reasoned that transient rashness, proclivity for risk, and inability to assess consequences all lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his or her deficiencies will be reformed. *Graham*, 560 U.S. at 67-69. The Court also noted that life without parole is an "especially harsh" sentence for a juvenile defendant as it condemns the juvenile to a larger percentage of the individual's life in prison than a much older individual who receives the same sentence. 560 U.S. at 70.

The Supreme Court then turned to the "penological justifications" for imposing a life without parole sentence on juvenile nonhomicide offenders. 560 U.S. at 71. The Court discussed the four common purposes of sentencing schemes: retribution, deterrence, incapacitation, and rehabilitation. 560 U.S. at 71-74. It found retribution was insufficient as justification for a life sentence without parole because "'[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender,'" and that "'the case for retribution is not as strong with a minor as with an adult.'" 560 U.S. at 71. Deterrence could not justify the sentence because the characteristics that make juveniles more likely to make bad decisions also make them less likely to consider the possibility of punishment, which is a prerequisite to a deterrent effect. Incapacitation could not support the sentence because of the difficulty in determining whether a juvenile defendant is incorrigible at the time of sentencing— i.e., "'to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" 560 U.S. at 72-73. Finally, rehabilitation could not justify the sentence

13

because it denies the prisoner the right to "reenter the community [based on] an irrevocable judgment about that person's value and place in society." 560 U.S. at 74.

After considering the especially harsh nature of a sentence of life without parole for juvenile offenders, the lack of penological justifications for the sentencing practice, and the characteristics of youth outlined in *Roper*, the Supreme Court considered several potential procedural solutions. *Graham*, 560 U.S. at 68-79. The Court concluded that a "categorical rule" was needed to "give[] all juvenile nonhomicide offenders a chance to demonstrate maturity and reform," and held that the Eighth Amendment forbids a sentence of life without parole for a juvenile offender that did not commit homicide. 560 U.S. at 68-82. But the Court noted that its holding does not mean that a state is "required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime." 560 U.S. at 79, 82. The Court ultimately held that the Eighth Amendment does not prohibit the states from imposing a life sentence on a juvenile nonhomicide offender so long as the state provides some meaningful opportunity for release during the offender's lifetime based on the offender's demonstrated maturity and rehabilitation, i.e., a meaningful possibility of parole. 560 U.S. at 82.

In 2012—two years after *Graham*—the Supreme Court applied some of the same reasoning to hold that the Eighth Amendment prohibits the punishment of life in prison without the possibility of parole for a juvenile offender *convicted of homicide* under a mandatory sentencing scheme. *Miller*, 567 U.S. 489. The Court did not impose a categorical ban to sentencing a juvenile homicide offender to life in prison without the possibility of parole but imposed a requirement that the Court consider a juvenile offender's youth and individual attendant characteristics as part of the sentencing process. 567 U.S. at 489.

At issue in *Miller* was an Eighth Amendment challenge in a consolidated appeal involving two 14-year-old offenders who received mandatory sentences of life

14

imprisonment without the possibility of parole based on their single murder convictions. In both defendants' cases, there was only one possible punishment for the murders: a statutorily mandated sentence of life without the possibility of parole. Based on the mandatory and lifetime nature of those sentences, the Court determined that the sentences implicated "two strands of precedent reflecting [its] concern with proportionate punishment." 567 U.S. at 470.

The Supreme Court began with the first strand of precedent by reaffirming the foundational principle articulated in *Roper* and *Graham*: "children are constitutionally different from adults for purposes of sentencing [b]ecause juveniles have diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471. The Court concluded that the mandatory nature of the sentencing schemes infringe on the constitutional principles announced in *Roper* and *Graham* because the "laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller*, 567 U.S. at 474.

With regard to the second strand of precedent that deals with the lifetime nature of the punishment, the Court stated that *Graham*'s treatment of juvenile life without parole sentences as analogous to capital punishment requires individualized sentencing where the judge or jury can assess any mitigating factors—including the mitigating qualities of youth—to ensure that the most severe penalty "is reserved only for the most culpable defendants committing the most serious offenses." 567 U.S. at 475-76. Relying on the analysis in *Graham*, the Supreme Court concluded that the flaw with a mandatory life sentence without parole was that it "preclude[s] a sentencer from taking [into] account . . . an offender's age and the wealth of characteristics and circumstances attendant to it," and "disregards the possibility of rehabilitation even when the circumstances most suggest it." *Miller*, 567 U.S. at 476-78.

Dovetailing the two strands of precedent, the Supreme Court ultimately held that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for a juvenile offender who has been convicted of homicide. The mitigating qualities of youth and its attendant characteristics, the harsh length of the term of imprisonment, and the mandatory nature of the sentencing scheme were key to the Court's decision. Unlike *Roper* and *Graham*, however, the Court expressly declined to impose a categorical ban on sentencing juvenile homicide offenders to life without parole. Instead, the Court required "only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, 567 U.S. at 483. So *Miller* does not prohibit a sentencing scheme that includes a punishment of life in prison without the possibility of parole for a juvenile offender who has been convicted of homicide so long as the Court considers a juvenile offender's youth and individual attendant characteristics as part of the sentencing process. 567 U.S. at 479-80. The Court noted that "sentencing juveniles to this harshest possible penalty will be uncommon," because the sentencer must be able to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 479-80. And the Court clarified that a sentence of life without parole should only be imposed on "the rare juvenile offender whose crime reflects irreparable corruption." 567 U.S. at 479-80.

Most recently, the Supreme Court decided that the holding in *Miller* "is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." *Montgomery*, 136 S. Ct. at 725. The State of Louisiana argued that the rule announced in *Miller* was procedural in nature and therefore not retroactive to juvenile offenders whose sentences were final when *Miller* was decided. But the Court disagreed. In its analysis, the Court acknowledged that *Miller*'s holding had both a substantive and a procedural component. The Court deemed *Miller*'s substantive holding to be that mandatory life without parole is an excessive sentence for children whose crimes reflect transient immaturity. But the Court found *Miller*'s requirement that the sentencer consider

16

a juvenile offender's youth and attendant characteristics before deciding that life without parole is a proportionate sentence was simply an attendant procedural process that was necessary to implement the underlying substantive rights under the Eighth Amendment. 136 S. Ct. at 734-35. The Court stated that "[t]here are instances in which a substantive change in the law must be attended by a procedure that enables a prisoner to show that he falls within the category of persons whom the law may no longer punish" and the required "hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." 136 S. Ct. at 735. The Court ultimately held "that *Miller* announced a substantive rule of constitutional law" that must be applied retroactively in its entirety. 136 S. Ct. at 736.

Having provided the legal framework for our forthcoming analysis, we turn to the merits of Williams' claim that the mandatory hard 50 life sentence imposed on him as a juvenile constitutes cruel and unusual punishment under the legal principles announced in *Miller*. Williams sets forth three arguments to support his claim. First, Williams argues the constitutional protections afforded under *Miller* are triggered in this case because his hard 50 sentence was imposed under a mandatory sentencing scheme. Second, he argues the constitutional protections afforded under *Miller* are triggered in this case because his hard 50 sentence is the functional equivalent of a life without parole sentence. Third, Williams argues he was deprived of the constitutional guarantees afforded under *Miller* because the sentencing court failed to fully consider his diminished culpability and heightened capacity for change before imposing the hard 50 sentence on him.

1. *The mandatory nature of the hard 50 sentencing scheme*

Williams argues the mandatory nature of the framework under which he was sentenced triggers the constitutional protections afforded under *Miller*. The State disagrees arguing that *Miller* does not apply in this case because the hard 50 sentencing

framework provided the court with discretion to determine whether the aggravating circumstances in Williams' case outweighed any mitigating circumstances. See K.S.A. 1999 Supp. 21-4635(c) (if sentencing court finds aggravating circumstances are not outweighed by any mitigating circumstances, court shall impose hard 50 sentence instead of hard 25 sentence). We find it unnecessary to resolve this dispute between the parties because, for the reasons stated below, we conclude *Miller* applies regardless of whether a sentencing scheme is mandatory or discretionary.

The states are split over whether the constitutional protections afforded by *Miller* apply when a juvenile defendant is sentenced under a discretionary sentencing framework. There was some hope that the split would be resolved by the United States Supreme Court in the Washington D.C. sniper case, *Mathena v. Malvo*, No. 18-217 (U.S.), which was argued before the Court on October 16, 2019. But before an opinion was issued, Virginia enacted new legislation allowing prisoners serving life sentences without parole for crimes committed as juveniles to be eligible for parole after 20 years of incarceration. The parties in *Malvo* stipulated to dismissal of the case, and the Supreme Court dismissed the appeal on February 26, 2020. *Mathena v. Malvo*, __ U.S. __, 140 S. Ct. 919, 206 L. Ed. 2d 250 (2020). Just over two weeks later, the Court granted certiorari in the case of *Jones v. Mississippi*, No. 18-1259 (U.S.), in which a distinct but related issue was presented: whether *Miller* and *Montgomery* require the sentencing court to find that a juvenile homicide offender is permanently incorrigible before sentencing him or her to a sentence of life without parole. 140 S. Ct. 1293 (2020).

So for now, the states remain divided. A majority of states conclude in published opinions that both mandatory and discretionary life sentences for juvenile defendants are disproportionate and violate the Eighth Amendment under *Miller* unless the sentencing court considers youth and its attendant characteristics. See *Landrum v. State*, 192 So. 3d 459, 466-67 (Fla. 2016); *People v. Holman*, 91 N.E.3d 849, 861-62 (Ill. 2017); *Steilman v. Michael*, 389 Mont. 512, 519, 407 P.3d 313 (2017); *Garcia v. State*, 903 N.W.2d 503,

509 (N.D. 2017); *Luna v. State*, 387 P.3d 956, 961 (Okla. Crim. App. 2016); *Aiken v. Byars*, 410 S.C. 534, 544, 765 S.E.2d 572 (2014); see also *State v. Valencia*, 241 Ariz. 206, 208-09, 386 P.3d 392 (2016); *People v. Gutierrez*, 58 Cal. 4th 1354, 1360-61, 171 Cal. Rptr. 3d 421, 324 P.3d 245 (2014); *State v. Riley*, 315 Conn. 637, 658, 110 A.3d 1205 (2015); *Veal v. State*, 298 Ga. 691, 700-03, 784 S.E.2d 403 (2016); *Johnson v. State*, 162 Idaho 213, 225, 395 P.3d 1246 (2017); *State v. Seats*, 865 N.W.2d 545, 555-58 (Iowa 2015); *Diatchenko v. District Attorney*, 466 Mass. 655, 668-71, 1 N.E.3d 270 (2013) (concluding that discretionary scheme allowing imprisonment without parole for juvenile offender violates state constitution but relying on reasoning of *Graham* and *Roper* in so concluding); *State v. Zuber*, 227 N.J. 422, 447, 152 A.3d 197 (2017); *State v. Young*, 369 N.C. 118, 125-26, 794 S.E.2d 274 (2016); *State v. Long*, 138 Ohio St. 3d 478, 483-84, 8 N.E.3d 890 (2014); *White v. Premo*, 365 Or. 1, 15-16, 443 P.3d 597 (2019); *Commonwealth v. Batts*, 640 Pa. 401, 444, 163 A.3d 410 (2017); *State v. Ramos*, 187 Wash. 2d 420, 440-44, 387 P.3d 650 (2017). Some of these courts first addressed the issue of whether the statutory schemes themselves were constitutionally valid before applying the rule in *Miller*. But regardless of the outcome on that issue, these courts ultimately applied the legal principles announced in *Miller* in cases where the trial court had at least some form of sentencing discretion.

A minority of states conclude in published opinions that *Miller* offers no protection if the sentencing court has even nominal discretion. See *Bell v. State*, 522 S.W.3d 788, 789 n.1 (Ark. 2017); *Conley v. State*, 972 N.E.2d 864, 879 (Ind. 2012); *State v. Williams*, 862 N.W.2d 701, 703-04 (Minn. 2015); *State v. Nathan*, 522 S.W.3d 881, 891 (Mo. 2017); *State v. Charles*, 892 N.W.2d 915, 920 (S.D. 2017); *Jones v. Commonwealth*, 293 Va. 29, 40-42, 56-57, 795 S.E.2d 705 (2017).

After due consideration, we agree with the majority of courts that conclude *Miller* applies to both mandatory and discretionary sentences alike. We see no constitutional reason why a juvenile with the mandated sentence of life should receive a *Miller* hearing,

while a juvenile with the discretionary life sentence is deprived of the opportunity to have his or her "youth and attendant characteristics" taken into account. Both *Miller* and *Montgomery* support our conclusion.

Supreme Court precedent now firmly establishes that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. Because juveniles lack maturity, are more vulnerable to negative influences, and have characters that are less well formed, they "are less deserving of the most severe punishments" than adults. *Graham*, 560 U.S. at 68 (citing *Roper*, 543 U.S. at 569). For the same reasons, the "penological justifications" for a sentence of life without parole are dramatically weakened for juveniles. *Miller*, 567 U.S. at 472-74. Applying these principles to a sentencing scheme that mandated life without parole, the *Miller* Court concluded that such a scheme "poses too great a risk of disproportionate punishment" to survive constitutional scrutiny. 567 U.S. at 479. The Court continued:

> "[G]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations omitted.]" *Miller*, 567 U.S. at 479-80.

The Eighth Amendment concerns expressed in *Miller* exist regardless of whether the juvenile in question was sentenced pursuant to a mandatory or discretionary sentencing scheme. True, *Miller* involved two juveniles sentenced to life without parole under mandatory sentencing schemes. But the reason the Court invalidated the sentences was not because the juveniles were sentenced under a mandatory sentencing scheme but because the sentencing court did not have an opportunity to distinguish between juveniles whose crimes reflect the transient immaturity of youth from those whose crimes reflect

20

irreparable corruption. The reasoning in *Miller* makes clear that the mere existence of discretion, unguided by the factors relevant to the proportionality of sentences for young offenders, could not save a juvenile sentence of life without parole. The Eighth Amendment permits sentencing a juvenile defendant to life without parole only after a court affirmatively considers the juvenile's "diminished culpability and heightened capacity for change" and then specifically determines that the juvenile is one of "the rare juvenile offender[s] whose crime reflects irreparable corruption." *Miller*, 567 U.S. at 479-80.

*Montgomery* later reinforced the rule in *Miller*. The Court reasoned that the *Miller* rule "rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation omitted.]" *Montgomery*, 136 S. Ct. at 734. The rule recognized in *Miller* is not about policing formalistic distinctions in state law between mandatory and nonmandatory sentences. Instead, it is a constitutional guarantee designed to protect individual rights by ensuring that any punishment imposed on a certain "class of offenders" (juveniles) satisfies the Eighth Amendment's proportionality requirements. See *Miller*, 567 U.S. at 470; see also *Roper*, 543 U.S. at 560 (noting that Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions"). So when an individual offender falls within the class, the question is not whether a sentencing court has an opportunity to make the constitutionally required inquiry but whether it seized that opportunity and actually provided the individual with the protections that the Constitution requires.

Based on the constitutional principles articulated by the United States Supreme Court in *Miller* and *Montgomery*, we hold that the Eighth Amendment prohibits sentencing a juvenile to life without parole unless he or she is "the rare juvenile offender whose crime reflects irreparable corruption" and that this prohibition applies regardless of whether the sentencing scheme is construed as mandatory or discretionary. No matter

how a state characterizes its sentencing scheme, and no matter what procedures it provides, that scheme must "give[] effect to *Miller*'s substantive holding" to be constitutional. *Montgomery*, 136 S. Ct. at 735. So "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" 136 S. Ct. at 734 (quoting *Miller*, 567 U.S. at 479.)

2. *Does the rule announced in* Miller *apply to Williams' hard 50 sentence?*

Although acknowledging that the punishment at issue in the *Miller* case was a sentence of life without parole and not a hard 50 sentence, Williams claims the rule in *Miller* is triggered here because his hard 50 sentence is the functional equivalent of a sentence of life without parole. The State disagrees, arguing the *Miller* rule is applicable to only those juveniles who are sentenced to life without *any* opportunity for parole and Williams is eligible for parole after serving 50 years in prison. The parties' dispute requires us to resolve two separate issues. First, we must decide whether a sentence expressed as a term of years, like the hard 50 sentence at issue here, can ever be functionally equivalent to a sentence of life without parole for purposes of applying *Graham* and *Miller*. If so, we must decide whether the lengthy hard 50 sentence imposed here is equivalent to life without parole.

a. *Term of years as the functional equivalent of life without parole*

In support of its argument that *Miller* is inapplicable to any sentence other than one expressly characterized by the sentencing court as a life sentence *without parole*, the State notes that two panels of this court previously held the *Miller* analysis does not apply to a hard 50 sentence. See *Ellmaker v. State*, No. 108,728, 2014 WL 3843076 (Kan. App. 2014) (unpublished opinion); *State v. Redmon*, No. 113,145, 2016 WL 5344034 (Kan. App. 2016) (unpublished opinion). The defendant in *Ellmaker* was convicted of

22

premeditated first-degree murder committed when he was 17 years old. The sentencing court imposed a hard 50 sentence. After his conviction was affirmed on appeal, Ellmaker filed a K.S.A. 60-1507 motion claiming that his hard 50 sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment under *Miller* because it was the functional equivalent of a sentence of life without parole. The district court denied the motion, and a panel of our court affirmed. The court held the *Miller* analysis does not apply to a hard 50 sentence because it is not the literal or functional equivalent of a life sentence without parole. In support of its holding, the panel relied on "the explicit way in which the United States Supreme Court has distinguished life without parole sentences and the death penalty and set them apart from all other sentences." *Ellmaker*, 2014 WL 3843076, at *10. Significantly, the panel did not consider the *Miller* case itself before ultimately holding that *Miller* did not apply. Instead, the panel limited its analysis to the categorical proportionality discussion in *Graham*.

Two years later, another panel of this court cited *Ellmaker* approvingly to hold that the *Miller* rule does not apply to a 732-month (61-year) aggregate sentence for rape, aggravated burglary, aggravated robbery, and aggravated intimidation of a witness because the aggregated sentence was not the functional or literal equivalent of a life sentence without parole. *Redmon*, 2016 WL 5344034, at *6. The *Redmon* panel acknowledged, however, that a split of authority on the issue had become more prevalent since *Ellmaker* was decided, with other jurisdictions concluding that the rationale set forth in *Graham* and *Miller* applies equally to both sentences of life without parole and sentences that are the functional equivalent of life without parole. Nevertheless, the panel ultimately relied on *Ellmaker* to hold that the rule in *Miller* did not apply to a hard 50 sentence. The panel did so without engaging in an analysis of the reasons provided by the *Ellmaker* panel for its decision or engaging in an analysis of the reasons for the mounting split in authority on the issue; the panel simply concluded it would be "reasonable" to go along with the holding in *Ellmaker* until the United States Supreme Court expressly resolved the issue. 2016 WL 5344034, at *6.

For the reasons stated below, we respectfully disagree with both the analysis and the holdings in *Ellmaker* and *Redmon*. See *State v. Urban*, 291 Kan. 214, 223, 239 P.3d 837 (2010) (one panel not bound by decision of previous panel). "While we must carefully consider each precedent cited to us, we also must uphold our duty to correctly determine the law in each case that comes before us. In doing so, we sometimes find that we must respectfully disagree with the opinion of another panel." *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012).

In *Graham*, *Miller*, and *Montgomery*, the United States Supreme Court placed constitutional limits on sentences that may be imposed on children. *Graham* held that children convicted of nonhomicide offenses cannot be sentenced to life without parole and must have a "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at 74-75, 82. *Miller* and *Montgomery* mandate that the states must provide a juvenile convicted of homicide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation except in the rarest of instances where the child is found to "exhibit[] such irretrievable depravity that rehabilitation is impossible." *Montgomery*, 136 S. Ct. at 733. In light of this mandate, one could not reasonably argue that a sentence fixed for a term of 100 years provides a meaningful opportunity for release, even though it is not characterized as a sentence of life without parole. So, at some point on the sentencing spectrum, a lengthy fixed sentence equates to a fixed life sentence without parole. Because the Supreme Court, 136 S. Ct. at 733, has "counsel[ed] against irrevocably sentencing [juveniles] to a lifetime in prison" without consideration of the *Miller* factors, we conclude a sentence that fails to provide an opportunity for release at a meaningful point in a juvenile's life triggers Eighth Amendment protections, regardless of whether it is labeled life without parole, life with parole, or a term of years. A contrary conclusion lacks support in reason and practice as it necessarily allows a sentencer to circumvent the Eighth Amendment prohibition against cruel and unusual punishment simply by expressing the sentence in the form of a lengthy term of numerical years rather than labeling for what it is:  a life sentence without parole.

24

And although not a categorical proportionality claim, we find the discussion in *Graham* regarding the absence of any legitimate penological justification for a sentence of life without parole to be just as persuasive in the context of considering whether the rule in *Miller* is triggered for a lengthy juvenile sentence for a term of years that is the functional equivalent of life without parole. See *Graham*, 560 U.S. at 71. The Supreme Court considered whether any theory of penal sanction could provide an adequate justification for sentencing a juvenile nonhomicide offender to life without parole and found none. The same test applied to a sentence of a lengthy term of years without eligibility for parole yields the same conclusion. The *Graham* Court's reasoning regarding retribution is equally applicable to a lengthy term-of-years sentence as it is to one labeled as "life." Sentences must directly relate to the personal culpability of the offender, which is diminished in the case of a juvenile offender who has not committed homicide. 560 U.S. at 71-72. In terms of deterrence, "'the same characteristics that render juveniles less culpable than adults suggest . . . that juveniles will be less susceptible to deterrence.'" 560 U.S. at 72. Regardless of what the punishment is, children are "less likely to take a possible punishment into consideration when making decisions," especially "when that punishment is rarely imposed." 560 U.S. at 72. There is no reason to believe that a juvenile would be deterred from crime depending on whether the sentence was life without parole or a number of years that is the functional equivalent of life without parole. Finally, there is no difference in terms of rehabilitation or incapacitation between two sentences that would both incarcerate the defendant for the functional equivalent of the defendant's life. Neither type of sentence contemplates the defendant returning to society for a period of time that is the functional equivalent of a term of life, either as a reformed citizen or as a potential threat.

Most courts that have considered the issue focus not on the label attached to a sentence but instead on whether imposing the sentence would violate the principles *Miller* and *Graham* sought to effectuate. See *Williams v. United States*, 205 A.3d 837, 844 (D.C. 2019); *Henry v. State*, 175 So. 3d 675, 680 (Fla. 2015) ("[T]he *Graham* Court

had no intention of limiting its new categorical rule to sentences denominated under the exclusive term of 'life in prison.'"); *State v. Shanahan*, 165 Idaho 343, 349-50, 445 P.3d 152, *cert. denied*, 140 S. Ct. 545 (2019); *People v. Reyes*, 63 N.E.3d 884, 888 (Ill. 2016); *State v. Null*, 836 N.W.2d 41, 70-71 (Iowa 2013); *Commonwealth v. Brown*, 466 Mass. 676, 691 n.11, 1 N.E.3d 259 (2013); *Zuber*, 227 N.J. at 448; *Ira v. Janecka*, 419 P.3d 161, 167 (N.M. 2018); *State v. Moore*, 149 Ohio St. 3d 557, 572-73, 76 N.E.3d 1127 (2016); *Premo*, 365 Or. at 12-13; *Commonwealth v. Foust*, 180 A.3d 416, 438 (Pa. Super. Ct. 2018); *Ramos*, 187 Wash. 2d at 438-39; *Bear Cloud v. State*, 334 P.3d 132, 144 (Wyo. 2014); see also *Budder v. Addison*, 851 F.3d 1047, 1059-60 (10th Cir. 2017); *McKinley v. Butler*, 809 F.3d 908, 914 (7th Cir. 2016); *United States v. Jefferson*, 816 F.3d 1016, 1020-21 (8th Cir. 2016) (although required to weigh statutory sentencing factors "as informed by" *Miller*'s Eighth Amendment jurisprudence, appellate court found no merit to defendant's substantive unreasonableness contention because sentencing court made individualized sentencing decision that took full account of distinctive attributes of youth); *Moore v. Biter*, 725 F.3d 1184, 1193-94 (9th Cir. 2013); *People v. Caballero*, 55 Cal. 4th 262, 268-69, 145 Cal. Rptr. 3d 286, 282 P.3d 291 (2012); *Riley*, 315 Conn. at 660-63; *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014); *Parker v. State*, 119 So. 3d 987, 999 (Miss. 2013); *Steilman*, 389 Mont. at 519-20; *State v. Finley*, 427 S.C. 419, 426, 831 S.E.2d 158 (Ct. App. 2019), *reh'g denied* August 22, 2019.

In applying the rule in *Miller*, we note that some of these courts did not ultimately conclude that the term of years to which the offender was sentenced rose to the level of cruel and unusual punishment under the Eighth Amendment. But critical to the issue presented in answering our question—whether a sentence expressed as a term of years *can ever* be equivalent to a sentence of life without parole—all of the courts applied the legal principles announced in *Graham* and *Miller* to a term of years sentence. In constitutional terms, these courts both explicitly and implicitly agreed that the substantive protections afforded to juveniles in the mandatory life without parole context should similarly flow to juveniles who are sentenced to a term of years that is the functional

equivalent of a sentence of life without parole. It stands to reason that, at least for the vast majority of juvenile offenders who are not deemed irredeemable, imposition of a sentence for a term of years that is the functional equivalent of life without parole unconstitutionally thwarts those juveniles' opportunities for release under both *Graham* and *Miller*.

We are persuaded by our own analysis and the compilation of cases set forth above holding that a sentence expressed as a term of years that fails to provide an opportunity for release at a meaningful point in a juvenile's life triggers the Eighth Amendment protections announced in *Miller*. Nevertheless, we acknowledge that there is a split of authority among the states and the federal circuits on the issue. See *United States v. Sparks*, 941 F.3d 748, 753-54 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 1281 (2020); *Bunch v. Smith,* 685 F.3d 546, 550-51 (6th Cir. 2012); *State v. Ali*, 895 N.W.2d 237, 247-48 (Minn. 2017); *Mason v. State*, 235 So. 3d 129, 134-35 (Miss. 2017); *State v. Zimmerman*, 63 N.E.3d 641, 647-48 (Ohio Ct. App. 2016); *Lewis v. State*, 428 S.W.3d 860, 863-65 (Tex. Crim. App. 2014); *Diamond v. State*, 419 S.W.3d 435, 440-41 (Tex. App. 2012); *Vasquez v. Commonwealth*, 291 Va. 232, 241-43, 781 S.E.2d 920 (2016); *State v. Gutierrez*, 2013 WL 6230078, at *1-2 (N.M. 2013) (unpublished opinion); *Grooms v. State*, No. E2014-01228-CCA-R3-HC, 2015 WL 1396474, at *4 (Tenn. Crim. App. 2015) (unpublished opinion); *State v. Williams*, No. 2012AP2399, 2013 WL 6418971, at *2-3 (Wis. Ct. App. 2013) (unpublished opinion). Cf. *Lucero v. People*, 394 P.3d 1128, 1132-33 (Colo. 2017) (finding that *Miller* does not apply in case where trial court imposed aggregate 84-year sentence on juvenile who committed multiple offenses); *Veal v. State*, 303 Ga. 18, 19-20, 810 S.E.2d 127 (2018) (declining to extend *Miller* in case where trial court imposed six consecutive life sentences plus 60 additional years on juvenile who committed multiple offenses); *Nathan*, 522 S.W.3d at 891 ("*Miller* has no application to Nathan's second-degree murder conviction, which does not call for mandatory life in prison without the possibility of parole, or to his multitude of nonhomicide convictions because *Miller* did not address the constitutional validity of

consecutive sentences, let alone the cumulative effect of such sentences."); *Johnson v. Commonwealth*, 292 Va. 772, 780-82, 793 S.E.2d 326 (2016) (finding that *Miller* does not apply in cases where juvenile is ordered to serve aggregate life sentence and has opportunity to be considered for parole).

While acknowledging the split in authority, we find the conclusion in these cases—that *Miller* categorically does not apply to a sentence expressed as a term of years—is inconsistent with the reasoning of *Roper*, *Graham*, and *Miller*, in which the Supreme Court repeatedly emphasized the lessened culpability of juvenile offenders, the difficulty in determining which juvenile offender is one of the very few that is irredeemable, and the importance of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75. In fact, the fundamental premise underlying the Court's decisions in both *Graham* and *Miller* is the recognition that juveniles are more amenable to rehabilitation than adults because they are less mature and are not fully developed, they lack the same culpability of an adult, and they have behavior that is transient. Those variances do not vanish simply because the sentence is for a lengthy term of years instead of life without parole. The constitutional framework upon which the Court in *Graham* and *Miller* constructed its holdings reflects that much more is at stake in the sentencing of juveniles than merely making sure that parole is possible. A juvenile offender sentenced to a lengthy term of years sentence should not be worse off than a juvenile offender sentenced to life in prison without parole who has the benefit of an individualized hearing under *Miller*. Accordingly, we hold the constitutional protections afforded under *Miller* are triggered when a juvenile offender convicted of premeditated first-degree murder is subject to a sentence for a term of years that is the functional equivalent to a sentence of life without parole.

b. *Hard 50 sentence is the functional equivalent to life without parole.*

We now must decide whether the hard 50 sentence imposed on Williams is the functional equivalent of a sentence of life without parole. "Courts that have grappled with the issue of how lengthy a sentence must be to trigger the protections of *Miller* often reference *Graham*'s instruction that juvenile offenders must retain a meaningful opportunity for release." *Premo*, 365 Or. at 14 (citing *Null*, 836 N.W.2d at 71-72 ["explaining that it does 'not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*'"]); *Casiano v. Comm'r of Corr.*, 317 Conn. 52, 73-75, 115 A.3d 1031 (noting that most courts that have considered the issue have determined that a sentence that exceeds life expectancy or that would make the individual eligible for release near the end of his or her life expectancy is a de facto life sentence).

In this case, Williams must serve a minimum of 50 years in prison for his single conviction before he can be considered for release. We are unaware of any state high court that has found a single sentence in excess of 50 years for a single homicide provides a juvenile with a meaningful opportunity for release. See *People v. Contreras*, 4 Cal. 5th 349, 369, 229 Cal. Rptr. 3d 249, 411 P.3d 445 (2018) (same for 50-year-to-life sentence); *Casiano*, 317 Conn. at 73, 79-80 (same for 50-year sentence); *Null*, 836 N.W.2d at 71 (same for 75-year sentence with parole eligibility after 52.5 years); *Zuber*, 227 N.J. at 448 (110-year sentence with parole eligibility after 55 years and 75-year sentence with parole eligibility after 68 years and 3 months "is the practical equivalent of life without parole"); *White*, 365 Or. at 15 (same for nearly 67-year sentence); *Bear Cloud*, 334 P.3d at 141-42 (same for 45-year-to-life sentence). In finding that a juvenile defendant's 50-year sentence is equivalent to life without parole for purposes of applying *Miller*, the Connecticut Supreme Court relied on *Miller* and *Graham* to construe the concept of life more broadly than biological survival; specifically, it found that the United States Supreme Court "implicitly endorsed the notion that an individual is effectively

29

incarcerated for 'life' if he [or she] will have no opportunity to truly reenter society or have any meaningful life outside of prison." *Casiano*, 317 Conn. at 78.

We conclude Williams' hard 50 sentence is the functional equivalent to life without parole for purposes of applying the rule in *Miller*.

3. *Individualized consideration of a juvenile's youth and attendant characteristics*

We now address Williams' claim that he was deprived of the constitutional protections afforded by *Miller* when the sentencing court failed to consider his diminished culpability and heightened capacity for change before imposing the hard 50 sentence. The applicable statute required the sentencing court to consider an exclusive set of statutory aggravating circumstances and a nonexclusive set of statutory mitigating circumstances in deciding whether to impose a hard 25 or a hard 50 sentence on Williams. See K.S.A. 1999 Supp. 21-4635(b). This statute applies to adults and juveniles alike, regardless of age. There is an enumerated mitigating circumstance in the statute that prompts the court to consider the "age of the defendant at the time of the crime" but, again, that consideration applies equally to adults and children alike. See K.S.A. 21-4637(g). As the Supreme Court in *Miller* observed, "'youth is more than a chronological fact.'" 567 U.S. at 476. The sentencing court's mere awareness of the fact that Williams was 14 years old at the time he committed the crime does not provide any evidence that the court specifically considered Williams' youth and its attendant characteristics.

There is nothing in the hard 50 sentencing scheme that facilitates the court's consideration of the characteristics and circumstances attendant to a juvenile offender's age or the fact that juveniles have diminished culpability and greater prospects for reform. And our review of the sentencing transcript reflects that the sentencing court did not consider any of the unique characteristics attendant to Williams' age, his diminished culpability, or prospects for reform before imposing the hard 50 sentence. We are not

surprised by this fact because Williams was sentenced in 2001, which was 11 years before *Miller* established the rule requiring individualized sentencing considerations for juveniles before imposing a sentence of life without parole or, in this case, its functional equivalent. See *Miller*, 567 U.S. at 489.

The State relied on the existence of four statutory aggravating circumstances to argue in favor of a hard 50 sentence for Williams: (1) he knowingly or purposely killed more than one person, (2) he committed the crime for the purpose of receiving money, (3) he committed the crime to avoid or prevent a lawful arrest or prosecution, and (4) he committed the crime in an especially heinous, atrocious, or cruel manner. K.S.A. 1999 Supp. 21-4636(b), (c), (e), (f).

Defense counsel disputed the existence of any of the statutory aggravating circumstances, except the killing of more than one person. Counsel relied on the expert's trial testimony to argue that the murders were "really a senseless act committed by a person who has a deficiency in understanding what he is doing." Counsel went on to argue that any aggravating circumstances the court found were outweighed by mitigating circumstances: his youth, his mental capacity, and his emotional state at the time of the offense. Counsel referenced the testimony of the clinical psychologist who found Williams had markedly impaired abilities to perceive and conceive of sequence of events. Counsel argued the case boiled down to Williams' inability "to think through the situation, define options, foretell consequences, make enlightened or objective choices, strategize and see those factors as—ahead before acting is deficient. And he is slow in processing, therefore will not examine, observe or—violent thoughts on his own."

People who knew Williams spoke on his behalf, each requesting the court impose a hard 25 sentence instead of a hard 50 sentence. A middle school teacher spoke to the absence of parents or other support systems in Williams' life growing up. An individual who employed Williams over the summer on some property she managed described

31

Williams as respectful, mannerable, very disciplined, and a person with potential. She expressed hope that "he could be put into some type of situation where he's not just thrown away and the key thrown away with him."

The adult child of the two victims killed by Williams spoke on behalf of the family, explaining how wonderful his parents were and the devastating impact his parents' murders had on his adult siblings, their children, and his parents' siblings.

After hearing the arguments of counsel and the statements of these various individuals, the court imposed a hard 50 sentence for each of the two first-degree murder charges. In support of its decision to impose the hard 50 sentence instead of the hard 25 sentence, the court noted that in cases like these, it had a duty to find a middle ground between a defendant's request for mercy and a victim's request for justice. Immediately after framing its duty in this way, the district court judge stated:

> "*The time to have helped Ronnell Williams was before this date, August of 1999. I mean, we talk about and we—we rail about and we—we bemoan the fact that this and that wasn't done for him. And now, you know, when it's too late, you can do something for him.*
>
> "Whatever it was that drew him and his brother to that address on that date and whatever it was that made him do the things that he did, and I confess, I will never know. I mean, I look at you and I—I don't have a clue as to what motivated you. And you've given me absolutely nothing to help me figure out what—what happened. To be honest with you, I frankly don't even think you know or that you have an answer for that."
> (Emphasis added.)

The court advised Williams that the decision he made on the day of the murders not only ruined his own life but the life of the victims and their surviving family members. The court then made a formal finding that the aggravating factors outweighed any mitigating factors presented.

32

The sentencing court did not consider any characteristics and circumstances attendant to Williams' age or the fact that, as a child, he was constitutionally different from adults for purposes of sentencing because juveniles have diminished culpability and greater prospects for reform. In fact, the italicized language above reflects that the court considered this 14-year-old boy, a child in middle school with no criminal history, to have zero possibility for reform and therefore was entitled to the most severe sentence that could be imposed (even on an adult) for the crime committed: life without the possibility of parole for 50 years.

We find Williams was deprived of the constitutional protections afforded by *Miller*, which require the sentencing court to consider his diminished culpability and heightened capacity for change before imposing the hard 50 sentence for his conviction of premeditated first-degree murder.

4. *Conclusion*

A sentencing court cannot impose a hard 50 sentence on a juvenile offender convicted of premediated first-degree murder without first considering the offender's youth and attendant characteristics, including the child's diminished culpability and heightened capacity for change, while keeping in mind that such a sentence is constitutionally disproportionate for all but the rarest of children whose crimes reflect irreparable corruption. We emphasize that neither *Miller*, the Eighth Amendment, nor our opinion in this case categorically prohibit a sentencing court from imposing a life sentence on a juvenile in all cases. The problem lies not with the potential substance of the sentence but with the procedure by which the court makes its decision to impose it. As *Miller* noted: "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 567 U.S. at 480. Our decision today does not disturb the finality of state

convictions. Those juvenile offenders with irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation will continue to serve hard 50 sentences. The opportunity for parole or release before 50 years has passed will be afforded to those who "demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S. Ct. at 736.

C. *Remedy*

Williams asks this court to vacate his hard 50 sentence under K.S.A. 60-1507 and remand for a new sentencing hearing at which the court would be required to consider his youth and its attendant characteristics as set forth in *Miller*. Under K.S.A. 2019 Supp. 60-1507(a), "[a] prisoner in custody under sentence of a court of general jurisdiction claiming the right to be released upon the ground that the sentence was imposed in violation of the constitution or laws of the United States" may "move the court which imposed the sentence to vacate, set aside or correct the sentence." If the court finds that the constitutional rights of the prisoner have been denied or infringed upon so as to render the judgment vulnerable to collateral attack, "the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence said prisoner or grant a new trial or correct the sentence as may appear appropriate." K.S.A. 2019 Supp. 60-1507(b).

Because Williams was deprived of the constitutional protections afforded by *Miller*, he is entitled to habeas relief in the form of an evidentiary hearing. See K.S.A. 2019 Supp. 60-1507(b). To that end, we remand the matter to the district court to determine whether imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder was constitutionally disproportionate under the Eighth Amendment. We specifically decline, however, to vacate Williams' sentence. A district court's sentence is final when initially pronounced from the bench. See *State v. Guder*, 293 Kan. 763, Syl. ¶ 2, 267 P.3d 751 (2012). District courts generally are prohibited from

34

modifying sentences that have not been vacated by the appellate court. *State v. Warren*, 307 Kan. 609, Syl. ¶ 1, 612-13, 412 P.3d 993 (2018). But the plain language of K.S.A. 60-1507 expressly provides the district court with the authority to vacate the sentence or provide other appropriate relief. See K.S.A. 2019 Supp. 60-1507(a) (habeas prisoner alleging sentence imposed in violation of the Constitution or laws of the United States or Kansas may move the court which imposed the sentence to vacate, set aside, or correct the sentence); K.S.A. 2019 Supp. 60-1507(b) (if habeas court finds that sentence imposed violates constitutional rights of movant, court may correct and resentence prisoner as appropriate). So if the habeas court on remand determines that imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder is constitutionally disproportionate under the Eighth Amendment, then the unconstitutional hard 50 sentence can be vacated or modified to a constitutionally proportionate sentence by the habeas court.

Finally, we look to *Graham*, *Miller*, and *Montgomery* for guidance in directing the habeas court on remand. In *Miller*, the Supreme Court held that a juvenile defendant may be sentenced to life imprisonment without parole but only if the sentencing court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. See 567 U.S. at 471-73, 479-80. The sentencing court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following:

- Consideration of the juvenile offender's chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences;

- Consideration of the family and home environment that surrounds the juvenile offender—and from which the juvenile offender cannot usually extricate himself or herself—no matter how brutal or dysfunctional;

- Consideration of the circumstances of the homicide offense, including the extent of the juvenile offender's participation in the conduct and the way familial and peer pressures may have affected the juvenile offender;

- Consideration of the possibility that the juvenile offender might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, the juvenile offender's inability to deal with police officers or prosecutors (including on a plea agreement) or the incapacity to assist his or her own attorneys; and

- Consideration of the juvenile offender's prospects for rehabilitation. See *Miller*, 567 U.S. at 477-78.

After identifying these characteristics as relevant considerations to determine a child's diminished culpability and heightened capacity for change, the *Miller* Court stated its belief that imposing a sentence of life without parole on a juvenile after considering these characteristics "will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" *Miller*, 567 U.S. at 479-80 (quoting *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68).

Although we have summarized the list of characteristics identified by the *Miller* Court as relevant to consider before imposing a sentence of life without parole for a juvenile convicted of homicide, we emphasize that this list is not exclusive. At

resentencing, the habeas court may consider any characteristic it finds to be relevant in deciding the issue before it: whether imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder is constitutionally disproportionate under the Eighth Amendment considering Williams' age at the time he committed the crime and its attendant characteristics, including his diminished culpability and heightened capacity for change.

We find additional guidance necessary on three more issues. The first issue relates to the decision of the original sentencing court to run both of Williams' hard 50 sentences concurrent to each other. The concurrent nature of these sentences was not an issue addressed by the parties on appeal, and we expressly exclude it from review on remand for purposes of our mandate.

The second issue concerns the scope of evidence that can be considered by the habeas court in deciding whether the hard 50 sentence imposed on Williams is constitutionally disproportionate given his age at the time he committed the crime and its attendant characteristics, including his diminished culpability and heightened capacity for change. Specifically, whether the court is limited to considering the evidence that was available at the time Williams originally was sentenced or whether the court can consider what has happened since Williams was placed in prison. Under *Miller*, the court must consider youth and its attendant characteristics at the time of sentencing to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Miller*, 567 U.S. at 480. But *Graham* explains that the Constitution "prohibit[s] States from making the judgment at the outset that [a juvenile] never will be fit to reenter society." 560 U.S. at 75. The Court later highlighted that Graham's sentence violated the Eighth Amendment because the state "denied him any chance to later demonstrate that he is fit to rejoin society." 560 U.S. at 79. And most significantly, the *Montgomery* Court specifically held that the petitioner's submissions regarding his evolution from a troubled, misguided youth to a model member of the

prison community are relevant to show an example of one kind of evidence that prisoners might use to demonstrate rehabilitation. 136 S. Ct. at 736 (although factual claims on appeal had not been established at an evidentiary hearing, the Court found relevant for consideration by the district court on remand that since imprisoned, Montgomery had helped establish an inmate boxing team, of which he later became a trainer and coach, that he had contributed his time and labor to the prison's silkscreen department, and that he strived to offer advice and serve as a role model to other inmates).

As noted above, the issue before the court at resentencing will be whether imposing a hard 50 sentence on Williams is constitutionally disproportionate under the Eighth Amendment considering his age at the time he committed the crime and its attendant characteristics, including his diminished culpability and heightened capacity for change. In assessing Williams' capacity for change, the court must be able to consider all facts relevant to deciding the issue, including evidence of whether Williams has, in fact, worked toward rehabilitation in the 20-plus years since he committed his crimes. To ignore that evidence in favor of a retrospective analysis of whether Williams had a heightened capacity for change at the time he committed his crime (or on the date of sentencing) is a useless exercise of speculation. If Williams is irretrievably depraved, permanently incorrigible, or irreparably corrupt, evidence from the past 20 years will bear that out.

The third issue provides guidance to the district court in the event it finds Williams' original sentence unconstitutionally disproportionate. At the time Williams was sentenced, the default sentence for premeditated first-degree murder was life without the possibility of parole for 25 years. See K.S.A. 1999 Supp. 21-4706(c); K.S.A. 1999 Supp. 22-3717(b)(1). Williams' sentence was enhanced to a hard 50 sentence based on the sentencing court's finding, by a preponderance of the evidence, that one or more aggravating circumstances existed and that the aggravators were not outweighed by mitigating circumstances. See K.S.A. 1999 Supp. 21-4635(c); *State v. Spain*, 263 Kan.

708, 714, 953 P.2d 1004 (1998) (holding that "the implicit standard of proof for aggravating circumstances under K.S.A. 21-4635[c] is preponderance of the evidence").

But in 2013, the United States Supreme Court issued its opinion in *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). *Alleyne* held that the facts a sentencing court relies upon to increase an offense's mandatory minimum sentence are elements of that enhanced offense. As such, those sentence-enhancing facts must be proved to a jury beyond a reasonable doubt to avoid a violation of the defendant's Sixth Amendment right to jury trial. 570 U.S. at 114-15. Following *Alleyne*, the Kansas Legislature held a special session in September 2013 to amend Kansas' hard 50 sentencing scheme. See L. 2013, ch. 1, § 1 (Special Session). Relevant here, the amended statute requires that a jury must find beyond a reasonable doubt that at least one aggravating circumstance exists and that the aggravating circumstance(s) are not outweighed by any mitigating circumstances before the court can enhance the sentence of a defendant convicted of first-degree premeditated murder from a hard 25 to a hard 50 sentence. K.S.A. 2013 Supp. 21-6620(b), (c).

On the issue of retroactivity, the amended statute provides that the amendments "shall not apply to cases in which the defendant's conviction and sentence were final prior to June 17, 2013, unless the conviction or sentence has been vacated in a collateral proceeding, including, but not limited to, K.S.A. 22-3504 or 60-1507, and amendments thereto." K.S.A. 2013 Supp. 21-6620(d). The amended statute also provides:

> "(e) Notwithstanding the provisions of subsection (f), for all cases on appeal on or after the effective date of this act, if a sentence imposed under this section, prior to amendment by this act, or under K.S.A. 21-4635, prior to its repeal, is vacated for any reason other than sufficiency of the evidence as to all aggravating circumstances, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence.

"(f) In the event any sentence imposed under this section is held to be unconstitutional, the court having jurisdiction over a person previously sentenced shall cause such person to be brought before the court and shall sentence such person to the maximum term of imprisonment otherwise provided by law." K.S.A. 2013 Supp. 21-6620(e), (f).

Although the Legislature amended the statute in 2014 and again in 2017, the substance of the language quoted above has not changed. See K.S.A. 2019 Supp. 21-6620(f), (g), (h).

Bottom line, in the event the district court finds it necessary to vacate Williams' original sentence because it was unconstitutionally disproportionate, the court must comply with the statutory directives set forth in K.S.A. 2019 Supp. 21-6620(e), (f), (g), and (h) when resentencing Williams. In doing so, the district court should determine in the first instance whether that process will result in a constitutionally satisfactory sentence comporting with *Miller* and, if not, how then to sentence Williams consistent with K.S.A. 2019 Supp. 21-6620.

D. *Lifetime postrelease supervision*

When the sentencing court ordered Williams to serve a hard 50 sentence, it also imposed lifetime postrelease supervision. For the first time on appeal, Williams argues that the district court's imposition of lifetime postrelease supervision renders his sentence illegal. "The court may correct an illegal sentence at any time while the defendant is serving such sentence." K.S.A. 2019 Supp. 22-3504(a); see *State v. Kelly*, 298 Kan. 965, 975-76, 318 P.3d 987 (2014) (defendant may challenge illegal sentence for first time on appeal). Whether a sentence is illegal under K.S.A. 2019 Supp. 22-3504 is a question of law over which an appellate court has unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016).

40

"A sentence is illegal under K.S.A. 22-3504 when:  (1) it is imposed by a court without jurisdiction; (2) it does not conform to the applicable statutory provisions, either in character or punishment; or (3) it is ambiguous with respect to the time and manner in which it is to be served." *State v. Hayes*, 307 Kan. 537, 538, 411 P.3d 1225 (2018).

Williams argues that the sentencing court lacked jurisdiction to impose lifetime postrelease supervision. The State agrees. "An inmate who has received an off-grid indeterminate life sentence can leave prison only if the [Kansas Prisoner Review] Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence." *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011); see *State v. Harsh*, 293 Kan. 585, 590, 265 P.3d 1161 (2011) (parole is separate and distinct from sentence; if defendant with off-grid indeterminate life sentence ever leaves prison, it will be because parole was granted). Williams' off-grid sentence permits parole eligibility after 50 years have been served, not lifetime postrelease supervision. See *State v. Ross*, 295 Kan. 1126, 1134, 289 P.3d 76 (2012) (defendant who received off-grid life sentence for felony murder was subject to lifetime parole instead of lifetime postrelease supervision).

Because the sentencing court erred in imposing lifetime postrelease supervision, that portion of Williams' sentence must be vacated. See *State v. Johnson*, 309 Kan. 992, 997-98, 441 P.3d 1036 (2019) (vacating order of lifetime postrelease supervision rather than remanding case for resentencing); *State v. Floyd*, 296 Kan. 685, 690-91, 294 P.3d 318 (2013) (same).

CONCLUSION

- We find Williams sufficiently showed the manifest injustice and exceptional circumstances necessary to justify the untimely and successive filing of his second K.S.A. 60-1507 motion. Accordingly, we reverse the district court's decision to

41

summarily deny Williams' habeas claim for relief and remand to the district court to hold an evidentiary hearing.

- We hold the constitutional protections afforded under *Miller* are triggered regardless of whether the sentencing scheme is mandatory or discretionary.

- We find Williams' hard 50 sentence is the functional equivalent of a sentence of life without parole for purposes of the constitutional protections in *Miller*.

- We find Williams was deprived of the constitutional guarantees afforded under *Miller* because the sentencing court failed to fully consider his diminished culpability and heightened capacity for change before imposing the hard 50 sentence on him. Based on this constitutional deprivation, we remand this K.S.A. 60-1507 matter to the habeas court to hold an evidentiary hearing. At the hearing, the habeas court must specifically consider evidence about whether imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder is constitutionally disproportionate under the Eighth Amendment given Williams' age at the time he committed the crime and its attendant characteristics.

- In considering the evidence presented on remand, the habeas court shall expressly decide whether Williams is irretrievably depraved, permanently incorrigible, or irreparably corrupt beyond the possibility of rehabilitation. In making this decision, the habeas court must consider, at a minimum, the following circumstances with regard to Williams' diminished culpability and heightened capacity for change, while keeping in mind that such a sentence is constitutionally disproportionate for all but the rarest of children whose crimes reflect irreparable corruption:

42

- Williams' chronological age at the time of the crime and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.

- Williams' family and home environment that surrounded him at the time of the crime.

- The circumstances of the homicide offense, including the extent of Williams' participation in the conduct and the way familial and peer pressures may have affected him.

- The possibility that Williams might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, Williams' inability to deal with police officers or prosecutors (including on a plea agreement) or the incapacity to assist his own attorneys.

- Williams' prospects for rehabilitation at the time of the crime as well as whether Williams has, in fact, worked toward rehabilitation in the 20-plus years since he committed his crimes.

- On remand, the habeas court shall not consider the concurrent nature of Williams' two hard 50 sentences in deciding whether imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder is constitutionally disproportionate under the Eighth Amendment given Williams' age at the time he committed the crime and its attendant characteristics.

- If the habeas court determines on remand that imposing a hard 50 sentence on Williams for the offense of premeditated first-degree murder is constitutionally

disproportionate under the Eighth Amendment, then the unconstitutional hard 50 sentence is necessarily rendered illegal and the habeas court has jurisdiction to vacate the sentence and set the matter to impose a sentence that complies with the constitutional mandate in *Miller* and with the statutory directives set forth in K.S.A. 2019 Supp. 21-6620.

- Both the evidentiary hearing—and any later hearings on sentencing disposition that may be held—must reflect that the habeas court meaningfully engaged in *Miller*'s central inquiry.

- That part of Williams' sentence imposing lifetime postrelease supervision is vacated.

Reversed, sentence vacated in part, and case remanded with directions.